1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     UNITED STATES OF AMERICA,

4        vs.
                                    Criminal No. 07-31 Erie
5     MICHAEL THOMAS JOYCE,
                 Defendant.
6

7        Transcript of Jury Trial Proceedings on Wednesday, October
     22, 2008, United States District Court, Pittsburgh,
8     Pennsylvania, before Maurice B. Cohill, Senior District Judge.

9

10    APPEARANCES:

11      For the Government:          Christopher A. Trabold, Esq.
                                     Christine A. Sanner, Esq.
12                                   Assistant U.S. Attorney
                                     17 South Park Row
13                                   Erie, PA 16501

14

15      For the Defendant:          Philip B. Friedman, Esq.
                                     CONNER RILEY FRIEDMAN &
16                                   WEICHLER
                                     17 West 10th Street
17                                   Erie, PA  16501

18                                   Robert R. Leight, Esq.
                                     PIETRAGALLO, BOSICK & GORDON
19                                   One Oxford Centre, 38th Floor
                                     Pittsburgh, PA  15219
20

21
     Court Reporter:                Juliann A. Kienzle, RMR, CRR
22                                   Fifth Floor USPO & Courthouse
                                     700 Grant Street
23                                   Pittsburgh, PA 15219
                                     (412) 261-6122
24
             Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.

1   (Proceedings held in open court; Wednesday, October 22, 2008.)

2           THE COURT:  First of all, let me say you're a hearty

3   band of warriors.  You did great yesterday and we appreciate,

4   the lawyers and I, all appreciate your patience.

5           We got through what I consider to be the toughest part

6   of the voir dire.

7           Now, from this group, the lawyers are going to be

8   choosing 16 jurors to serve in the trial of this case which will

9   begin as soon as the jury is chosen.

10          So, with that, lawyers, you may begin your choices.

11      (Whereupon, there was a pause in the proceedings.)

12          THE CLERK:  As I call out your name, will the

13  following jurors in the jury box please step down and take a

14  seat in the back of the courtroom.

15          David Pezzuolo.

16          Maureen Krautz.

17          Mark Marecic.

18          Diane Kubala.

19          Josiah Kovac.

20          I will now seat the twelve jurors and two

21  alternates.

22          Robert Nystrom, Juror No. 133, juror seat No. 1.

23          No. 144, Mary Jean Johnson, juror seat No. 2.

24          No. 13, Susan Saxman, juror seat No. 3.

25          No. 95, Philip Kushnar, juror seat No. 4.

1              No. 90 Christine Cole, juror seat No. 5.

2              No. 202, Michael Jones, juror seat No. 6.

3              No. 161, Geraldine Murton, juror seat No. 7.

4              No. 124, Paul Hovanec, juror seat No. 8.

5              No. 17, Vincent Barbi, juror seat No. 9.

6              No. 49, Ashley Schuring, seat No. 10.

7              No. 40, Annemarie Frick, juror seat No. 11.

8              No. 33, Gregory Anker, juror seat No. 12.

9              No. 165, Mary Ann Schmertz, alternate seat No. 1.

10             No. 129, William Jackson, alternate seat No. 2.

11             No. 66, Stephen Cargo, alternate seat No. 3.

12             No. 51, Ralph Giordano, alternate seat No. 4.

13             THE COURT:  We will administer the oath.

14        (Administration of the oath.)

15             THE COURT:  Well, ladies and gentlemen who are not

16   selected for this jury, I certainly want to thank you on

17   behalf of everyone involved in this.  As I said when I came in

18   this morning, you were very patient and courteous yesterday

19   and we all appreciate your kind attention.

20             I guess those ladies and gentlemen that aren't

21   going to be in the jury should report back to the third floor.

22   If you'll go down to the third floor to the jury room.

23             Ladies and gentlemen of the jury, this is Richard,

24   and that's Katie, and they're going to be your den mother and

25   den father during the case of the trial.  Right now we'll take

1  a break until ten-thirty and Richard and Katie will show you

2  folks where our jury room is from now on.  That's where you

3  should be when you're not in the courtroom.

4     (Discussion in chambers.)

5          THE COURT:  I just wanted to go over with you a few

6  things here before we start.

7          What I'm going to do now is give them a preliminary

8  charge, which I think Richard gave to everybody.  As I

9  understand, it's now a seven-count indictment.

10         MR. TRABOLD:  Eight -- it used to be nine -- two

11 counts of mail fraud, six counts of money laundering.

12         THE COURT:  It's an eight-count indictment charging

13 three separate instances of mail fraud.

14         MR. TRABOLD:  Two now separate instances of mail

15 fraud occurring in August and November of 2002 and six

16 separate instances of engaging in monetary transactions and

17 property derived from unlawful activity occurring in November

18 2002, February, March and April of 2003.

19         Now, how much of this indictment should I read to

20 them, do you think?  I had thought about just reading "on or

21 about the date specified below" and explain to them what is

22 going to be specified below.  I'd read:  Counts One and Three

23 state on or about the dates specified below, in the Western

24 District of Pennsylvania, the defendant, so forth, for the

25 purpose of executing the aforesaid scheme and artifice to

1  defraud, and in attempting to do so, did knowingly cause to be

2  delivered by the United States mail the mail matter more

3  particularly set forth below, each such use of the United

4  States mail being a separate count of this indictment.

5          I would say Count One, it was mailed on or about

6  August 26, 2002, from Mr. Joyce to Attorney Ted G. Miller of

7  the Erie Insurance Group; it was a note with an enclosure.

8          And then the third count -- we don't have a second

9  count here -- the third count was mail matter mailed on

10  November 15, 2002, from Mr. Joyce to Ronald G. Habursky, a

11  litigation specialist with the Erie Insurance Group.

12          Those are the first two counts.

13          And then I would say that Title 18 of the United

14  States Code, 1341, the statute upon which Counts One through

15  Three of the indictment are based states in relevant part, and

16  I read the relevant part of 1341.

17          Then Counts Four through Nine are the so-called

18  money laundering counts.  On or about the date specified, then

19  I would read that, and then down to Count Four on 11-27, I

20  would just go through the counts pretty much like that, all

21  said to be in violation of Title 18, Sections 1957 and 2.  And

22  then I would read 1957.  We weren't going to read two, but I

23  can if you want.  That's the one, that two is the one that

24  says if you -- if you're involved even peripherally, you're

25  still guilty of whatever.

1           Is it okay if I don't read that?

2           MR. FRIEDMAN:  Sure, there's no need to read that.

3           THE COURT:  In every criminal case, the party to

4  the case -- you have the rest of that preliminary charge.

5           So does that sound all right?

6           MR. FRIEDMAN:  That sounds fine.

7           MR. TRABOLD:  Yes.

8           THE COURT:  Now, there was some discussion a few

9  days ago about who can sit at counsel table.

10          MR. TRABOLD:  Your Honor, we're asking you to

11 reconsider that simply because we don't think there's any

12 valid basis under Rule 615 to exclude the second agent.  This

13 is a complex case that's going to take a number of weeks --

14          THE COURT:  I was going to look it up.  We got done

15 sooner than I thought.  I was going to look it up.

16          MR. LEIGHT:  Rule 615.

17          THE COURT:  Exclusion of Witnesses.  At the request

18 of a party, the court shall order witnesses excluded so they

19 cannot hear the testimony of other witnesses, and it may make

20 the order of its own motion.  This rule does not authorize

21 exclusion of (1) a party who is a natural person, or (2) an

22 officer or employee of a party which is not a natural person

23 designated as its representative by the attorney, or (3) a

24 person whose presence is shown by a party to be essential to

25 the presentation of the party's cause, or (4) a person

1   authorized by statute to be present.

2          So I suppose you're saying No. 3, a person whose

3   presence is shown by a party to be essential to the

4   presentation of the case?

5          MR. TRABOLD:  Sure.  The cases say that this

6   exception falls under either (2) or (3), Your Honor.

7          MR. LEIGHT:  Your Honor, if I may be heard.  No. 2

8   says:  An officer or employee of a party which is not a

9   natural person.

10         That's the United States of America, obviously,

11  they're not a natural person.  So, it says officer or

12  employee; not plural, singular.

13         In addition, it says, or a person.  So it would

14  imply that if it's not a natural person, they can have a

15  representative or a person whose presence is shown, not both.

16  So the government can't have (2) and (3), they're either

17  entitled to an employee or an officer, which would be the

18  second exception.

19         There's case law.  I have cases here.  The Fourth

20  Circuit has ruled that it was an error for a court to allow

21  two agents in a courtroom.  They eventually said it was

22  harmless error.

23         But the Third Circuit has, I think the Third

24  Circuit case was Drummond, and in that case, the facts were a

25  little bit different.  The defense wanted the agent to testify

1  first before being permitted in the court and the court said

2  he couldn't order that.  The Third Circuit said you couldn't

3  order the government to call their witnesses in an order, that

4  way, they allowed the agent, one agent to stay in.

5           So, again, Your Honor, I think it's highly

6  prejudicial.

7           In addition, one of the juror questionnaires,

8  Questionnaire 45 said:  In fact, if the IRS and FBI both

9  brought charges, the person must be guilty.

10          So, again, that gives the impression to the jury

11  that this must be a very serious case because it requires two

12  governmental agencies to prosecute this individual.

13          So that would be our position.

14          MR. TRABOLD:  Judge, if I may be heard, the

15  Drummond case that counsel references the Court specifically

16  allowed two case agents to sit at the table.  That's a Third

17  Circuit case.  There's absolutely no prejudice to the

18  defendant in this case by allowing these two case agents to

19  sit in.

20          THE COURT:  Are they both going to testify?

21          MR. TRABOLD:  They are both going to testify, but

22  they are both going to testify -- they both handled kind of

23  half of the case.  This is a lengthy, complex case and in a

24  tax case you had recently with Ms. Sanner up in Erie, you

25  allowed two case agents to sit in.

1          THE COURT:  That was without objection, of course.

2          MR. TRABOLD:  Sure.  But there's no prejudice to

3    the defendant if you let these two case agents sit in on this

4    complex case, which is going to take a number of weeks, which

5    is going to be relatively document intensive.  And the Third

6    Circuit is specifically allowed in the Drummond case and the

7    Second Circuit and the Sixth Circuits have specifically

8    allowed the presence of two case agents, especially in cases

9    that are document intensive and relatively complex like this

10   case.

11         The jurors have already seen the case agents

12   sitting out there and been told that it is a case investigated

13   by the FBI and IRS, so there's no prejudice to the defendant

14   by having them sit there.  As well as the fact that both

15   counsel are going to have their paralegals who, of course,

16   aren't witnesses, but they're going to be there sitting at

17   counsel table assisting them in the presentation of the case.

18   It only seems fair to me that I be allowed to have case agents

19   do the same thing.

20         MR. LEIGHT:  I would suggest a compromise.  We

21   would be willing to allow two case agents in the room if at

22   the conclusion of each day the government would tell us what

23   witnesses they're calling next.  That would make the trial

24   move faster.

25         THE COURT:  We normally do that anyway.

1            MR. LEIGHT:  We have asked and they said no.

2            MR. TRABOLD:  I normally don't do that.

3            THE COURT:  You always get Jencks material.

4            MR. TRABOLD:  We already turned over the Jencks

5    material.

6            MR. LEIGHT:  We got 600 pages of testimony Friday

7    afternoon for 37 individuals.

8            MR. TRABOLD:  I normally don't do that.

9            THE COURT:  I'm going to let the agents both sit at

10   the table.  I think you ought to give them -- that's up to

11   you, but I think you ought to give them the names of the

12   witnesses the night before.  It's going to make it go faster.

13           MR. LEIGHT:  Will you do that?

14           MS. SANNER:  It's going to be somewhat difficult in

15   this case with scheduling.

16           MR. TRABOLD:  That is my concern.  We're obviously

17   pulling these witnesses down from Erie.  Depending on how we

18   go and where we go --

19           THE COURT:  Tell him the day before.  You'll know

20   the day before who is coming.

21           MR. TRABOLD:  I will make every effort to do that.

22           MR. LEIGHT:  Please tell us.  It makes it so much

23   easier.  It's fundamental fairness.

24           MR. TRABOLD:  That's fine, if I can be told the

25   defense witnesses that they're going to call the day before.

1          MR. LEIGHT:  I don't have a problem with that.

2          THE COURT:  Anything else before we go?

3          MR. FRIEDMAN:  The only thing -- this can be off

4  the record.

5      (Discussion off the record.)

6      (Open court.)

7          THE COURT:  Ladies and gentlemen, what I'm going to

8  do now is give you sort of a preliminary charge to tell you

9  what to expect during this trial.

10         As you know by now, you have been sworn in the case

11  of the United States of America against Michael Thomas Joyce.

12  What I intend to say now is simply an introduction to the

13  trial of the case.  It's not a substitute for the detailed

14  instructions about the law and the evidence that I'll give you

15  at the end of the trial, and sometimes during the trial some

16  question or legal question arises and I might have to give you

17  an explanation during the trial, but most of my detailed

18  instructions will be at the end.

19         This is a criminal case.  It's commenced by the

20  United States, which I may sometimes refer to as the

21  prosecution or the government.  And the defendant here is

22  Michael Thomas Joyce.

23         The case is based on an eight-count federal grand

24  jury indictment which charges him with two separate instances

25  of mail fraud occurring in August and November of 2002, and

1   six separate instances of engaging in what are called monetary

2   transactions in property derived from unlawful activity

3   occurring in November 2002 and February, March and April of

4   2003.

5           I'm not going to read the whole indictment to you,

6   but I do want to give you these essential parts of it.  Count

7   One -- there's no Count Two here -- Counts One and Three are

8   the so-called mail fraud counts.  That states that on or about

9   the dates -- you'll get a copy of this at the end of the

10  trial, by the way, when you begin your deliberations.

11          Anyway, Counts One and Three briefly say:  On or

12  about the dates specified below in the Western District of

13  Pennsylvania, the defendant, Michael Thomas Joyce, for the

14  purpose of executing the aforesaid scheme -- the indictment

15  has described scheme a little bit -- for the purpose of

16  executing the aforesaid scheme and artifice to defraud, and in

17  attempting to do so, did knowingly cause to be delivered by

18  the United States mail the mail matter, more particularly set

19  forth below, each such use of the United States mail being a

20  separate count of this indictment.

21          And then Count One.  It was a mailing on August 26,

22  2002, and it came from Mr. Joyce to Attorney Ted G. Miller of

23  the Erie Insurance Group.  It was a note with an enclosure.

24          Then Count Three occurred on November 15, 2002, and

25  that was from Mr. Joyce to Ronald G. Habursky, the litigation

1    specialist at Erie Insurance Group.  That was a letter.  All

2    said to be in violation of 18 United States Code, Section

3    1341, and 2.

4          That particular section of the code, 18 United

5    States Code, Section 1341 says this:  Whoever having devised

6    or intending to devise any scheme or artifice to defraud, for

7    the purpose of executing such scheme or artifice or attempting

8    to do so, knowingly causes to be delivered by the United

9    States mail according to the direction thereon any such matter

10   or thing shall be guilty of an offense against the United

11   States.

12         Now, Counts Four through Nine are so-called money

13   laundering counts.  In those counts -- to those counts, the

14   indictment says this:

15         On or about the date specified below in the Western

16   District of Pennsylvania, and elsewhere, the defendant,

17   Michael Thomas Joyce, did knowingly engage and attempt to

18   engage in the following monetary transactions affecting

19   interstate commerce in criminally derived property with a

20   value greater than $10,000, which property was derived from

21   specified unlawful activity, in that the defendant, Michael

22   Thomas Joyce, engaged in the following transactions, knowing

23   that the funds were derived from a criminal offense, when, in

24   fact, said funds were derived from mail fraud, each such

25   transaction constituting a separate count of this indictment.

Count Four states that on November 27, 2002, he made a $300,000 initial deposit into a TD Ameritrade individual brokerage account.

Count Five, November 27, 2002, $18,058.02 payment to his line of credit account at National City Bank.

Count Six, February 14, 2002, $20,000 deposit to Sue Sullo Realtors for the purchase of property located in Millcreek Township, Pennsylvania.

Count Seven, March 10, 2003, $18,770.75 payment to Liberty Harley Davidson, 32 East Cuyahoga Falls Boulevard, Akron, Ohio, for the purchase of a motorcycle.

Count Eight, March 19, 2003, $94,537.74 down payment to Select Settlement, Inc. for the purchase of property located in Millcreek Township, Pennsylvania.

Count Nine, April 15, 2004, $27,500 down payment to Dunkirk Aviation, New York, toward the purchase of a 1978 Cessna 206 airplane.

Now this is all said to be in violation of 18 United States Code, Section 1957 and 2.

1957, the statute states that:  Whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity shall be guilty of an offense against the United States.

Now, in essence, those are the charges against

1  Mr. Joyce.

2          Now, I want to tell you, elaborate a little bit

3  about the law and how the trial works.

4          You always have to keep in mind that in every

5  criminal case, the government is merely a party to the case.

6  That was emphasized during the jury selection process here.

7  But the government is merely a party to the case, no more and

8  no less.  There's no presumption that just because the

9  government is bringing the action that the defendant must be

10  guilty.  On the contrary, the government always has the burden

11  throughout the trial of proving the guilt of the defendant

12  beyond a reasonable doubt because he's pleaded not guilty.

13  Questions of fact will be presented at the trial and you have

14  been chosen as jurors to determine those facts.

15          The indictment simply sets out the charges.  It's

16  not evidence against the defendant and the government has the

17  burden of proving each of the essential elements of the

18  indictment beyond a reasonable doubt.  A reasonable doubt is a

19  doubt based upon reason and common sense, the kind of doubt

20  that would make a reasonable person hesitate to act.  Proof

21  beyond a reasonable doubt must, therefore, be proof of such a

22  convincing character that a reasonable person would not

23  hesitate to rely and act upon it in the most important of that

24  person's own affairs.  The purpose of this trial is to

25  determine whether the government can meet its burden to show

1   that the defendant is guilty beyond a reasonable doubt.

2            Now, the defendant in this case is charged with

3   several offenses and each offense is charged in a separate

4   count of the indictment.  The number of offenses charged is

5   not evidence of guilt and this should not influence your

6   decision in any way.  You must separately consider the

7   evidence that relates to such offense and you must return a

8   separate verdict for each offense.  For each offense charged,

9   you must decide whether the government has proved beyond a

10  reasonable doubt that the defendant is guilty of that

11  particular offense.  Your decision on one offense, whether

12  guilty or not guilty, should not influence your decision on

13  any other offenses -- the other offenses charged.  Each

14  offense should be considered separately.  You'll be expected

15  to perform your duty of deciding the facts without bias for

16  either the defendant or the government.  The law does not

17  permit jurors to be governed by sympathy or prejudice or

18  public opinion.  Both the defendant and the government expect

19  that you will consider all of the evidence impartially, follow

20  the law as I state it and reach a just verdict regardless of

21  the consequences.

22            Now, the trial will proceed in this order.

23            First, the parties may make an opening statement.

24  The government may make an opening statement at the beginning

25  of the case and the defendant, through his lawyer, may then

1    make an opening statement, or delay an opening statement until

2    the close of the government's case.  What is said in those

3    opening statements is not evidence.  The statements merely

4    serve to provide an introduction to the case.

5            Secondly, the government will then introduce

6    evidence in support of the charges contained in the

7    indictment.

8            Third, after the government has presented its

9    evidence, the defendant may present evidence, but a defendant

10   is never obligated to do so.

11           Fourth, at the conclusion of the evidence, then the

12   government will present an oral argument in support of its

13   side and the defendant will present an oral argument in

14   support of his side.  Then after that, the government is

15   permitted to make a rebuttal.  What is said in those closing

16   arguments is not evidence, just as what was said in the

17   opening statements is not evidence.  The purpose of the

18   closing arguments is to present the parties' position as to

19   what the evidence shows and what conclusions may be drawn from

20   that evidence.

21           I'll then instruct you on the law, after which

22   you'll retire to consider your verdict.  Your verdict must be

23   unanimous.

24           Under our system of criminal procedure, you, the

25   jurors, are the sole judges of the fact.  There are really two

judges in the courtroom.  I'm the judge with respect to the
law, what legal questions that arise, but you folks
collectively as a jury are the judge of the facts.  It's up to
you to determine what the facts of the case are.

So, therefore, it's especially important that you
perform that duty carefully and conscientiously for ordinarily
there's no means of correcting an incorrect finding of fact by
the jury.  You're going to be in that jury room by yourselves,
there's not going to be a court reporter there or any person
from the court, you'll be by yourselves, and, therefore, if
you made a mistake on the law, no one would ever know that and
that would be unfair to the parties in the case.  Because of
that, it's obviously important that you hear all the testimony
and weigh it, give it fair weight.  If at any time you do not
hear something, raise your hand and we'll have it repeated for
you.

As I said, you are the finders of the facts, but,
on the other hand, I instruct you that the law which you're to
consider is to be only the law as I give it to you.  It's your
duty to follow that law even though you might disagree with
it, as I explain it.  There's an important reason for this.
As I said, your deliberations will be secret.  So if you were
to use a different law or some incorrect conclusion of law
from that which I give you, no one would ever be able to know
this and you would be committing an injustice to one of the

1  parties in the case.

2          So one of the things that is important for you

3  folks is to decide on the credibility, that is, the

4  believability of the witnesses who are going to testify.

5          Some of the ways by which you may judge the

6  credibility of a witness is the manner in which the witness

7  gives the testimony, the witness' appearance and attitude on

8  the stand, the reasonableness or unreasonableness of what the

9  witness says; the witness' means of knowing any facts; the

10 witness' interest in the outcome of the case; any feeling the

11 witness may have for or against one of the parties; the

12 witness' ability to remember or any previous contradictory

13 statements that the witness has made.  Ultimately, you must

14 decide what weight you will give to the testimony of each of

15 the witnesses who have testified.

16         Some people think that the jury will have available

17 to it a copy of the transcript which our court reporter

18 records during the trial.  That's just not so.  You're

19 expected to use your own memories to recall what was said in

20 the testimony.  During the trial, I am going to permit you to

21 take notes.  Many courts don't permit note-taking by jurors,

22 but I'm going to permit that.  A word of caution is in order.

23 There's often a tendency to attach undue important to matters

24 which one has written down.  Some testimony which might be

25 considered unimportant at the time it's presented, and thus

not written down, might take on greater importance during the
trial in light of all the evidence presented.  Therefore,
you're instructed that your notes are only a tool to aid your
individual memory.  Above all, your memory should be your
greatest asset when it comes time to deliberate and render a
decision in this case.

When you leave at night, leave your notes in the
jury room.  During the trial, any notes taken by any juror
concerning this case should not be disclosed to anyone other
than a fellow juror.

There will be occasions during the trial when
objections will be made to certain evidence presented or
questions asked.  Keep in mind that an attorney has a duty to
object if that attorney believes that a question is improper
or that certain evidence should not be admitted.  Unless there
is an objection, I don't have to make any ruling on the
evidence.  Therefore, you should not hold it against either
side when there's an objection.  At times I may sustain the
objection, or I may order that you disregard certain
testimony.  Sometimes a witness will blurt out something from
the witness stand that's just improper in one way or another,
sometimes kind of scandalous.  If I say disregard that
statement, I know that human reaction probably is somebody
will say, geez, the Judge said forget it, now that's the one
thing I'm going to remember, which is a human reaction, too,

1    but if I would tell you to disregard certain testimony and you

2    don't feel you can forget it, put it at least off in another

3    compartment of your mind and don't consider that in arriving

4    at your final verdict.  You're expected to follow my

5    instructions on that and not consider any evidence to which an

6    objection has been sustained or which I've told you to

7    disregard.

8            From time to time there will be conferences over

9    here of what we call side-bar.  That's when the attorneys and

10   I meet at the end of the bench to discuss some legal point.

11   Those conferences are held outside your hearing because -- not

12   because we're trying to withhold any evidence from you that

13   you ought to hear but rather to avoid mistakes.  It's simply a

14   way of being sure that you have before you only legally

15   correct evidence on which to base your decision.  I hope we

16   won't have too many conferences, but I'm sure there will be

17   some and I ask your patience in advance.

18           At times I may ask witness questions.  If I do,

19   it's to bring out matters that I feel should be brought out

20   and not in any way to reveal my opinion about the facts or to

21   indicate the weight that I feel you should give the testimony

22   of a witness.

23           No one is permitted to talk to you about this case.

24   I don't even want you to talk to each other about it or

25   anybody else.  By "anyone," I mean your wife, your husband,

1   your children, your parents, your relatives, your friends, no

2   one at all.  I don't, as I said, I don't even want you to talk

3   to each other about it until after you've heard all the

4   evidence and until I give you my final charge on the law and

5   you begin your deliberations in the jury room.  We have a good

6   reason for requiring this.  Sometimes a juror might make up

7   his or her mind early in a case and talk to others about it

8   and perhaps later on in the trial, other evidence comes in and

9   now that juror might want to change his or her mind but

10  because that juror has already stated a position, then, again,

11  it's a human reaction, that person might be hesitant or

12  embarrassed to admit that he or she was wrong the first time

13  around.  So, we just avoid that situation entirely by telling

14  you don't discuss the evidence with each other or anybody else

15  until after you've heard it all and until you've heard my

16  charge to you on the law.  And then when you begin to

17  deliberate, of course, you should discuss it freely and openly

18  and just as long as you and your fellow jurors want to discuss

19  it.

20          I suspect there will be articles in the newspapers

21  or on the radio or television about this case.  If there

22  should be, we ask you, please, don't read about it.  Please

23  don't listen on the radio.  Please don't watch it on TV.  If

24  it comes up, we ask you to turn it down or turn it off.  Here

25  again, I think the reason is fairly clear.  You've taken an

oath to decide this case on the law as I give it to you and on
the evidence as you hear it in this courtroom.  The parties
have a right to expect you to live up to that oath.  If you
would talk to someone outside the courtroom or read someone
else's impression of what is going on here about either the
facts or the law, it just wouldn't be fair to anyone.  You'd
be listening to excerpts or reading excerpts put together by
persons not having the same privilege of sitting throughout
the case as you do and who won't know as much about the case
as you will.  So again we say avoid that situation by simply
not reading about it.  If you want to see what is said in the
papers or whatever, get someone at home to cut the thing out
and save it for you until after the trial is over.

If, however, at any time during the trial you read
or hear something outside the courthouse that you think might
influence your decision, bring that to my attention
immediately.  If anyone should attempt to discuss the case in
your presence, when, for example, you're standing in the
hallway or in the elevator or out on a street corner, then you
should immediately remove yourself from the range of hearing.
And if you feel that they're insisting on trying to talk to
you, you should advise me about that right away because it's a
very serious matter.  The attorneys in this case are very
affable persons, but if they see you somewhere, they're not
going to chat with you because they're under my instructions

1    not to talk to you outside the courtroom under any

2    circumstances.

3           After the closing arguments, as I said, I'll

4    explain the law that applies to the case.  When you retire,

5    you'll consider the law as I have given it to you, explained

6    it to you and then you will determine the facts and arrive at

7    your decision.  It's for you to decide what conclusions you

8    will draw from the testimony and the evidence.

9           Now, as far as housekeeping goes, normally, as I

10   told you at the outset, we'll only be trying the case Monday

11   through Thursday of each week.  No court on Friday.  We'll

12   normally start at nine-thirty in the morning.  My usual

13   routine is start at nine-thirty in the morning and work until

14   twelve-thirty, around noon, twelve-thirty, with a break

15   midmorning, and then we'll start again at quarter of two and

16   work until sometime between four-thirty and five, just trying

17   to stop at a logical stopping point with a mid afternoon

18   break.  That will be generally our routine.

19          You have been assigned a very solemn and a very

20   important duty.  It's one I'm sure you will accept and devote

21   your best conscientious and best efforts with all these

22   instructions in mind.

23          We'll now have the opening statement on behalf of

24   the government.  When the actual testimony begins, we'll give

25   you pens and pads to take your notes.  As I said, what you

1   hear at the beginning is not evidence, it's simply a statement

2   by the government where he expects, he or she expects the

3   trial to go.

4         MR. TRABOLD:  Thank you, Your Honor.

5         May it please the Court and counsel, ladies and

6   gentlemen, this case is about this defendant's scheme to

7   defraud two insurance companies.  The evidence in this case is

8   going to show that that was a scheme created in greed out of

9   his desire and need for more money and completed outright

10  lies, half truths and the omissions of obviously material

11  facts.

12        You're going to hear fairly soon as we begin this

13  case that on August 10, 2001, this defendant was involved in

14  an automobile accident.  The accident occurs at this

15  intersection which is at West 12th Street and Asbury Road in

16  Millcreek Township, which is a suburb of Erie, Pennsylvania.

17  You can consider this intersection right here is the Erie

18  International Airport.

19        You may say to yourself, how can the Erie airport

20  possibly be an international airport, but I assure you,

21  there's at least one or two flights every ten years to Canada.

22        However, what you have here is north/south, Asbury

23  runs north/south, and West 12th Street is kind of a main

24  thoroughfare in Erie running east and west.

25        A woman by the name of Amber Cooper is on her way

1    to work.  She's driving north on Asbury Road to go to work on

2    West 12th Street.  She comes to this intersection.  There's

3    kind of a merge lane to go onto West 12th Street.  She's

4    parked here and in front of her is the defendant's vehicle.

5    She's driving a 1992 Ford Explorer.  The defendant is driving

6    his 2001 Mercedes Benz.  She stops behind him, comes to a full

7    stop.  He stopped in front of her and they're both waiting in

8    that merge lane to get onto West 12th Street going east.

9            You're going to hear from her that she is kind of

10   looking back across the intersection to see if vehicles are

11   coming.  And there's a vehicle that is coming and it's

12   traveling kind of quickly, but she believes that it's going to

13   stop.  She thinks that the defendant is going to start moving

14   his vehicle out onto the road.  She looks back once that

15   vehicle comes to a stop.  She then begins to slowly move her

16   vehicle forward when she believes the defendant is moving his

17   vehicle forward.  And there's an impact because he stops his

18   vehicle while she's beginning to inch forward.

19           She is going to tell you that in no uncertain terms

20   this accident happened when she was going no faster than two

21   to three miles an hour.  And you're going to hear there's no

22   damage to her vehicle whatsoever.  You're going to hear

23   there's slightly over $2,700 worth of damage to the

24   defendant's vehicle.  No police or ambulance are ever called.

25           What happens after this very minor impact?  They

1  pull off to the side of kind of a lot next to the airport.

2  She gets out of her car in order to exchange information.  The

3  defendant gets out of his car for the same purpose, to

4  exchange information.

5      You're going to hear from her that she doesn't

6  detect that he's injured in even the slightest regard.  He

7  doesn't have any difficulty getting out of his car.  He

8  doesn't say he's injured.  All that he really says when he

9  identifies himself is, he identifies himself as Michael Joyce,

10  as in Judge Michael Joyce.  She says to herself, kind of --

11  you're going to hear what she says during the course of this

12  trial is that I'm not from Erie, it didn't really register

13  with me, I didn't know who Michael Joyce was.

14      He tells nothing to her at all about being injured.

15  She observes no injuries.  He gets back into his vehicle

16  without mentioning even the slightest thing about injuries,

17  she gets back into her vehicle and they both drive away.

18      The defendant's vehicle is drivable.  Her vehicle

19  is completely unscathed.  The accident she will tell you

20  happens at two to three miles an hour and certainly no more

21  than five.  That is the accident that causes the damage to

22  this defendant's vehicle in this case.  A two to three mile an

23  hour fender bender.

24      You're going to hear that what comes quite a bit

25  later are insurance claims by the defendant.  He makes your

1  typical insurance claim for the repairs on his vehicle,

2  roughly a little bit over $2,700.  Ms. Cooper is insured by

3  State Farm Insurance and she has a policy limit of $50,000.

4       In August of 2001, within approximately two or

5  three weeks after the accident, this defendant tells State

6  Farm Insurance that even though he's feeling a little pain

7  from the accident or he's a little bit sore, he is not going

8  to pursue a bodily injury claim.  He tells the insurance

9  company that, State Farm that in 2001, in August.

10       He then does not begin to pursue a further claim

11  with State Farm until the summer of 2002.  In July of 2002, he

12  then begins to pursue an insurance claim with State Farm.

13  You're going to hear evidence that on September 4, 2002, State

14  Farm pays this defendant his policy limit of $50,000 -- Amber

15  Cooper's policy limit of $50,000.

16       Erie Insurance then -- this defendant is insured

17  with Erie Insurance, and he has a total policy limit of

18  $500,000, which amounts to really, $250,000 of insurance on

19  two vehicles which is then lumped together.

20       You're going to hear that after his vehicle is

21  fixed and that is all taken care of, he waits until the summer

22  of 2002, again, in August, moving into September, before he

23  really begins to discuss any type of bodily injury settlement

24  or insurance claim with Erie Insurance.

25       What that essentially amounts to is he uses his

1   underinsured motorist portion of his policy, which essentially

2   if you get into an accident with somebody else who doesn't

3   have enough insurance, you can then go against your own

4   insurance under the underinsured motorist provision.

5          This defendant tells Erie Insurance during the

6   course of his accident claim that the accident happened

7   between 20 and 25 miles an hour.  On November 26, 2002, Erie

8   Insurance pays him $390,000.

9          You're going to hear that there are two mailings in

10  this case.  The Judge gave you kind of a heads up about the

11  mailings.  This is one of them.  It's a very brief note that

12  this defendant sends.  You should take note, sends on his

13  Superior Court letterhead to Erie Insurance.  It's dated

14  August 24, 2002.  It says:  Ted, enclosed is a copy of the

15  letter that I sent to Mr. Keim as you requested.  Mike.

16         Basically, what he does, in August, late August of

17  2002, he sees an attorney for Erie Insurance that he knows by

18  the name of Ted Miller out at a bar at happy hour in Erie.

19  You're going to hear from Ted Miller.  Ted Miller is going to

20  tell you that he's in the bar with friends for happy hour with

21  employees from Erie Insurance and the judge comes up to him

22  and begins to discuss his pending claim.  He's thinks that

23  that's a little odd because he's not involved in the insurance

24  claim and he really doesn't know anything about it.  They then

25  have a brief discussion.  And the next day or two, he gets

1   this note from the judge.  Here's what you requested from me,

2   and the judge sends it on Superior Court letterhead.

3   Ted Miller is going to tell you he has no recollection of ever

4   requesting anything from this defendant regarding the

5   insurance claim.  This is the enclosure he sends.  Again you

6   can see on the enclosure, the letter to an individual by the

7   name of Mr. Keim, Chris Keim who works for Erie Insurance,

8   again Judge Michael Joyce.  And it's a letter where he's

9   talking about I want to get my insurance claim started

10  essentially.  You can see, it's dated August 24th and he

11  passes that on to Ted Miller and indicates in the note to Ted

12  Miller, this is the material you requested.  I do not expect

13  that Ted Miller is going to tell you he requested one single

14  thing from this defendant.

15          That's one of the mailings.

16          The other mailing is this document right here

17  dated November 15, 2002.  This defendant sent this to another

18  employee of Erie Insurance by the name of Ronald Habursky, who

19  you're going to hear during this course of this case.  He ends

20  up to be the employee of Erie Insurance that handles this

21  defendant's insurance claim.  And on November 15, 2002, this

22  defendant writes to Mr. Habursky:  "On September 17, 2002, I

23  provided you with a copy of all my medical specials and

24  pursuant to your request, I provided you with copies of all

25  medical reports and office notes, along with a Narrative

1   Statement of Damages on September 20, 2002.  It is now almost

2   two months later and I have not heard a word from Erie

3   Insurance.

4           "I'm disappointed that you have elected to ignore

5   my claim and have not complied with the notification

6   requirements of the Unfair Insurance Practices Act.  If I do

7   not hear from you as a result of this correspondence, I will

8   assume that I need to retain counsel and litigate this

9   matter."

10          Eleven days later Erie Insurance pays this

11  defendant $390,000.

12          Now, those mailings, those two mailings give rise

13  to what we call the mail fraud counts of this indictment.  The

14  Judge is going to instruct you at the close of the case what

15  the elements of mail fraud are.  Every federal crime has

16  elements which are the components that need to be proven.  In

17  this case and any mail fraud case, a mail fraud essentially

18  amounts to a scheme to defraud for the purpose of obtaining

19  money or property from somebody, committed by a person who has

20  the specific intent to defraud and basically knows that

21  they're committing a scheme to defraud and the use of the

22  United States mail is in furtherance of the scheme somehow.

23          Now, you're going to hear from the Judge that the

24  mailing itself doesn't need to be fraudulent, the mailing just

25  needs to be committed in furtherance of the scheme in some

1  fashion.

2         With regard to this mailing, he sends this mailing

3  without question threatening a lawsuit, and within days they

4  paid him $390,000.

5         Now, this case is those two mailings.  And then

6  this defendant is charged with a variety of what we call money

7  laundering counts.  Those counts you can essentially think of

8  as this.  You take money which you have gotten from a scheme

9  or artifice to defraud, you then conduct financial

10 transactions with that money, and, in this case -- I'll talk

11 to you in a few minutes about some of the financial

12 transactions that this defendant conducted with his money --

13 but when we say money laundering counts, in this case, that's

14 essentially what we're talking about.  You take your

15 ill-gotten gains and then take that money and buy certain

16 things or conduct financial transactions.

17        You are going to hear a variety of different pieces

18 of medical testimony and medical evidence in this case.  We

19 will present some medical evidence through a variety of

20 different doctors, and I expect that the bulk of what this

21 defendant will present, if he chooses to present anything,

22 will be medical type testimony and witnesses.

23        This case is not about that medical testimony.

24 It's not about that medical testimony itself for these

25 reasons.  You are going to hear an activity level from this

defendant which does not match his medical claims.  The

activity level and the things that he was doing you will hear

will not match up with his medical claims.  He tried to paint

a picture to the insurance company that he was almost

completely debilitated.  When you review his activities in

this case, you will see that the claims he made to his doctors

are not accurate.  So this case is not about his medical

claims.  It is also not about his medical claims because you

will discover through the course of this case that he was not

providing his medical practitioners complete information.  I

want you to think of it this way.  Garbage in, garbage out.

If you don't give your doctor 100 percent accurate

information, your doctor's ability to diagnose what is wrong

with you is significantly hampered.

What this case is about are this defendant's lies

and half truths and omissions to the insurance companies.

Many of those lies and omissions and half truths are contained

in what we call a Narrative Statement of Damages.  You saw,

you heard the judge in his first letter, mailing the

enclosure, he explicitly references the Narrative Statement of

Damages.  The Narrative Statement of Damages is an 18-page

document that he provides to Erie Insurance on September 20,

2002.  In that document, in that 18-page document, which he

prepares and provides to the insurance company himself, he

claims that the August 2001 accident affected his professional

1    and private life in a very significant way.

2            He indicates in the document that he seeks

3    compensation for past pain and suffering, future pain and

4    suffering, and loss of the enjoyment of life.

5            He makes a variety of different claims throughout

6    the document, some of which are inconsistent.  He makes claims

7    that his ability -- that he loved to golf and his ability to

8    golf was significantly hampered by the August 10th accident.

9    He tells the insurance company, I love to scuba dive, it's one

10   of my favorite things to do, and I can't scuba dive anymore as

11   a result of this accident.  He goes beyond that.  He tells the

12   insurance company that he did not renew his scuba diving

13   licenses and his scuba diving teaching certificate.  We're

14   going to get into that in a little bit more detail, but you

15   will come to see that those statements were complete lies.

16           He indicates to the insurance company that the

17   accident affected his ability to work, that it caused him to

18   be in need of surgery on his cervical and lumbar spine

19   regions.

20           He tells the insurance company that he had the

21   nomination for the Pennsylvania Supreme Court.  What he says

22   to them is, I had the nomination -- we'll discuss that in a

23   little bit more detail -- and because of this accident, I can

24   no longer proceed with that, and it hampered my ability to be

25   on the Supreme Court.

1          He tells the insurance company in conjunction with

2     that that he could not drive or his ability to drive long

3     distances was significantly curtailed.

4          He also goes on and on and on in the Narrative

5     Statement of Damages about the impact on his ability to think

6     and concentrate.  This is what he says at the end of his

7     Narrative Statement of Damages.  I want you to remember this

8     quote and take it with you throughout this case.

9          "Certainly a review of this narrative only gives a

10    small glimpse of the past, present and future pain, suffering

11    and loss of enjoyment of life Judge Joyce has and will

12    experience.  In short, there has not been a day since the

13    accident that Judge Joyce has been pain free.  The permanent

14    injuries he sustained in the accident have had and continue to

15    have a significant effect on every facet of his professional

16    and private life."

17          Remember that quote.  Remember that quote when you

18    hear what it is he was doing after this accident.

19          This is what he says about golf.  You're going to

20    notice if you get a chance to look at this document, as we go

21    through the trial, you're going to notice a lot of what he

22    says about golf, even in his own statement is inconsistent.

23    He says on Page 7 of the narrative statement:  I could not

24    complete a round of golf.

25          So then Page 8:  I attempted to play golf five

1    times since the beginning of 2002, but I could not complete a

2    round.

3            On Page 8 he says:  I cannot golf, swim or jog.

4            Page 12:  Following the accident, I did not golf

5    for the rest of the 2001 season.

6            On Page 12, he says he's now physically unable to

7    play golf.

8            On Page 12, he tried golf a few times in the 2002

9    season.

10            Page 17, he's not able to play golf at all for the

11    remainder of the 2001 season.  He reiterates again, I

12    attempted to play golf on several occasions during the summer

13    of 2002.  Then he says he's unable to complete a round of golf

14    due to extreme pain and discomfort.

15            This is what the evidence will show about his

16    ability to play golf.  The evidence will show that he played

17    golf over 20 times between August of 2001 and September of

18    2002, complete rounds of golf.  And the way we know that is

19    the following.  These agents went to the Western Pennsylvania

20    Golf Association and subpoenaed, provided them a grand jury

21    subpoena for their handicap system records.  It's essentially

22    the organization in Western Pennsylvania where you send your

23    golf handicap.  You're going to see that he submitted multiple

24    full round scores to the Western Pennsylvania Golf Association

25    handicap system between August 2001 and when he gets his money

1   from the insurance company.  Numerous rounds of golf are

2   recorded by him with that handicap system.

3            You're also going to hear from a witness by the

4   name of Shelley Buehler that in March of 2002 she golfed full

5   rounds with this defendant at two premier type golf courses in

6   Florida, one called Old Memorial and one called Bay Hill.  She

7   is going to bring into court and we're going to show you the

8   score cards from those rounds which she kept.

9            You're also going to hear that this defendant

10  golfed on a trip that he took to a resort called Breezes in

11  Jamaica in January of 2002.  Shelley Buehler is going to tell

12  you that they golfed.  Shelley Buehler was his fiance at the

13  time of these events.

14           But we don't stop just with Shelley Buehler on this

15  golf stuff.  We have obtained all the way from Jamaica golf

16  records from that resort called greens fee control sheets.

17  They show quite clearly this defendant's name on the greens

18  fee control sheets.  You're also going to hear that he golfed

19  at Lake Shore Country Club, which is the country club he

20  belonged to, and some of the times he golfed at Lake Shore

21  Country Club, those scores were not submitted to the handicap

22  system.

23           You're also going to hear that he golfed at Peek'n

24  Peak in May of '02 and golfed at Nemacolin in June of '02.

25  The evidence will show that the representations he made about

1   golf are not true.   And we have obtained evidence outside the

2   United States for you that shows that.

3           This is what he said about scuba diving.   He said

4   he cannot golf, swim or jog.   He's not dove or taught diving

5   since the date of the accident.   He attempted to scuba dive in

6   a pool to see if the pain could be tolerated.   He did not

7   renew his scuba teaching certificate for 2002.   He has not

8   taught scuba diving or dove since the date of the accident of

9   August 10, 2001.   This is what he tells the insurance company

10  in September of 2002 about scuba diving.

11          This is what the evidence will show.   You'll hear

12  evidence from his then fiance that they went scuba diving in

13  January of 2002 in Jamaica.   You will see the documents, you

14  will see the documents where he renewed his scuba diving

15  instructor's license for 2001 and he did that in late August

16  2001, within days after the accident.   So when he tells the

17  insurance company that he did not renew his scuba diver's

18  instructor's license, that is a flat out lie.   He also renewed

19  his diving instructor's license for 2002 in December '01 and

20  then did the same thing for 2003 in December '02.   So he

21  continually renews his scuba instructor's license.

22          You're also going to hear that he goes to a place

23  in the Caribbean called Bonaire, which is a very well known

24  hot spot for good diving, in December of 2002.   Actually, he

25  gets his money on November 26th of 2002 from Erie Insurance.

1  Part of the money he got was because he couldn't scuba dive.

2  Within days after getting his money in mid December of '02,

3  this defendant goes to Bonaire and scuba dives.  You will see

4  the documentation from the Netherlands Antilles which proves

5  that he went scuba diving.  What it amounts to as it relates

6  to December 2002, he goes back again to Bonaire in January --

7  late January, early February of '03.  What he does in January,

8  February of '03 is he fills out a diving release form.  On the

9  diving release form there's a place when was the last time you

10 dove?  He writes down December 10, 2002.

11      You'll also hear evidence that he continued to

12 dive.  He continued to go to Bonaire in '04 and '06.  You may

13 even see some pictures of him actually diving in '04 or '06,

14 or at least '04.  So the evidence will show that on scuba

15 diving, he did not tell the insurance company the truth.

16      This is what he says about his nomination for the

17 Supreme Court of Pennsylvania.  This is a direct quote at the

18 top.  "Perhaps the most significant, long-lasting result of

19 the injuries sustained by Judge Joyce concerns his desire to

20 run for a vacant seat on the Supreme Court of Pennsylvania."

21      He also says:  In 2001, Judge Joyce received the

22 republican nomination for the vacancy created by the

23 retirement of Chief Justice Flaherty and that he withdrew from

24 the 2001 election with the understanding that he would run in

25 2003.

1        None of this is true.  The evidence will show this.

2   He also makes these claims -- I'm sorry, he says the statewide

3   campaign would require him to drive all over the state, 50,000

4   miles.  He's unable to drive for longer than two hours without

5   taking a break and there's no way he could cope with the

6   physical and mental demands of a campaign.  The evidence will

7   show that this defendant never had the nomination to the

8   Pennsylvania Supreme Court in either 2001 or 2003, nor did he

9   have his party's endorsement.

10       You'll also hear evidence that despite his claims

11  that he could not drive long distances, he was able to drive

12  long distances.  He drove to Virginia in August of 2002 with

13  his first wife to visit their son, a drive from Erie of

14  approximately eight hours.  I expect that she will tell you

15  that at no point in time did they have to stop because he

16  couldn't handle the drive physically.

17       You're also going to hear from his then fiance,

18  Shelley Buehler, that in September and October of '01, she and

19  this defendant drove to Notre Dame to go to two Notre Dame

20  football games, and she does not recall him having even the

21  slightest problem in doing that.

22       He makes a variety of claims throughout the

23  Narrative Statement of Damages about the impact that the

24  accident had on his ability to work as a judge.  He says

25  things like in the last several months, he noticed an

1   inability to keep focused on subject matter and that he had

2   problems concentrating and that it takes longer to do the same

3   task than it did before the accident.  And that he has to work

4   12 hours a day, most every weekend to get his work done

5   because he can't concentrate and he can't process information.

6         He says he can't sit for more than a two-hour

7   stretch.  He's had to cope with a variety of physical

8   ailments, including headaches, leg cramping, back pain,

9   including psychological symptoms like anxiety and depression.

10  He also tells the insurance company that he spends the

11  majority of his time in his chambers at his office.  He claims

12  to the insurance company that his staff was concerned about

13  his ability to absorb information and it took him longer to do

14  work and complete it.  He actually also says he had to lie

15  down at midmorning because of mental fatigue.  This is a

16  direct quote from the Narrative Statement of Damages.

17        What you're going to hear as the evidence comes in

18  is that he claims to the insurance company that he was so

19  debilitated and he was suffering so many symptoms that he

20  actually thought he had Lou Gehrig's disease.  That's what he

21  says.  He says the two months between the request for

22  consultation with Dr. Shields of the Cleveland Clinic

23  Department of Neurology and the actual exam on May 3, 2002,

24  was the longest two months in his life.  He believed that he

25  may in fact have Lou Gehrig's disease or some other serious

1    neurological disease which was life threatening.

2           So in the Narrative Statement of Damages he

3    basically says from March and April of '02 leading up to the

4    appointment with Dr. Shields, he thought he had Lou Gehrig's

5    disease, and, basically, he didn't think it was going to be a

6    good result.  He thought he had a life-threatening

7    neurological disease.

8           The unfortunate part about that for this defendant

9    is he failed to tell the insurance company even the slightest

10   word, not one single word about his flying activity in this

11   case.  And what you will hear in this case is that in April of

12   2002, one of the months that this defendant said was one of

13   the longest months of his life because he thought he had Lou

14   Gehrig's disease, this defendant went to the FAA and applied

15   for a private pilot's license.

16          On April 8, 2002, he undergoes an FAA physical and

17   what you're going to hear, you're going to hear a lot from the

18   FAA doctor and from other individuals involved in flying, and,

19   as you may imagine, the FAA doesn't allow anyone who wants to

20   fly get up in the air.  You have to go through a medical

21   clearance process.  So on April 8, 2002, he goes to the FAA

22   physician's office to begin the process.  He has a physical on

23   that day.  The FAA's physician finds nothing wrong with him.

24   The FAA physician checks his upper and lower extremities, his

25   head, face, neck and scalp, spine and other musculoskeletal

1   systems, does a neurologic test.  You're going to hear this

2   physical lasted about 15 or 20 minutes.  What I want you to

3   keep in mind as it relates to this flying evidence is at the

4   same time this defendant tells the insurance company he

5   thought he had Lou Gehrig's disease, he walks into the FAA

6   physician's office and starts the process of getting a pilot's

7   license.

8            Prior to the physical, though, he fills out the FAA

9   form 8500-8, which is essentially a medical history form.  He

10  checks no for all of those areas.  Depression/anxiety?  No.

11  Frequent or severe headaches?  No.  Neurological disorders?

12  No.  Other illness, disability or surgery?  No.  Any current

13  medication?  No.  Any physician visits within the last three

14  years, excluding gallbladder.  No.  He tells the FAA that he

15  had his gallbladder removed.

16           He goes through that entire medical clearance

17  process.  Fills out the forms, tells the FAA there's

18  absolutely nothing wrong with him.

19           The FAA doctor conducts a physical of him, finds

20  nothing wrong with him.  The FAA then frees him to begin the

21  process of getting his pilot's license.  This all begins in

22  the same months this defendant told the insurance company he

23  was so bad off, he thought he had Lou Gehrig's disease.  And

24  he does not mention even one iota to the insurance company

25  ever that he was flying.

1          You're going to hear that after he's cleared, he

2    starts to fly, and this same defendant who told the insurance

3    company that he couldn't work because he was having mental

4    issues and he couldn't think and he didn't know essentially

5    what was going on and he had to work 12 hours a day on and on

6    the weekends, he takes the FAA written pilot's exam in April

7    of '02.  He scores a 95 on the exam.

8          After he scores a 95, he starts to take flight

9    lessons beginning in late April.  He accumulates from April to

10   the end of '02 almost 70 hours of flight time, what you're

11   going to hear from the FAA people is an extraordinary amount

12   of flight time in a very small window of time.  He flies on

13   numerous occasions, approximately 50 times to rack up that

14   amount of hours.

15         You're going to hear from his flight instructor,

16   Kevin Poor.  We're going to bring him back here from Portland,

17   Oregon.  He's going to tell you in his experience with this

18   defendant.  He deemed him to be a very athletic person and an

19   eager person to learn and a very good student who would

20   regularly study up and make sure he knew the material.  He is

21   not going to tell you that he detected even the slightest

22   thing wrong with this defendant in the 50 or so times he flew

23   with him from April of '02 to the end of 2002.

24         You will also hear that in September of 2002,

25   actually September 26, this defendant passes his FAA flight

1   test to get his airman's license.  He flies with an FAA flight

2   examiner by the name of Martin Haski out of the New Castle

3   airport.  You're going to hear from Martin Haski.  Martin

4   Haski is going to tell you what is all involved in the FAA

5   flight test.  There is a portion of it that is kind of a

6   written exam or I guess really more of an oral exam, but it's

7   a ground exam, you have to pass that, then you go do your

8   flight.  He's going to tell you that this defendant does an

9   exceptional job on the FAA oral exam.  They then get in the

10  plane and this defendant without really any problems

11  whatsoever, passes his FAA flight test.  He doesn't bother to

12  tell the insurance company this, however.  He continues to

13  present to the insurance company a picture of a man who is

14  completely debilitated who needs to work 12 hours a day and on

15  the weekends in order to get his work done.

16          He continues to fly for several years.  He renews

17  his FAA pilot's license in 2004 and 2006.  Again, he only

18  lists gallbladder surgery as any medical problem.  In April of

19  '05 he passes his instrument rating test.

20          This is what he tells the insurance company about

21  his need for surgery.  He indicates outside of the NSD when

22  he's speaking to Ron Habursky, the adjuster, that a doctor in

23  Pittsburgh has indicated to him that he will need neck surgery

24  but recommends prolonging it.

25          You're going to hear from Dr. Matt El-Kadi,

probably the beginning part of next week, who is the doctor

this defendant saw in Pittsburgh and Dr. El-Kadi is not going

to say he recommended surgery for this defendant.  He is

actually I expect going the tell you that he recommended a

conservative course of treatment.  He did not recommend

surgery for this defendant.  So, that is not the truth, the

representation that this defendant made with regard to

surgery.  And you are, in fact, going to probably hear from

several surgeons in this case and none of them recommended

that this defendant have surgery.

He makes a variety of different claims with regard

to his ability to exercise or workout.  He makes it clear to

the insurance company that he was an individual prior to the

August 10, '01 accident who took great pains to maintain some

level of physical fitness.  He indicates in the Narrative

Statement of Damages at Page 16 that he's only able to engage

in light workouts once or twice a week.  He indicates that he

has to avoid any and all exercise which will place a load on

the cervical or lumbar spine, which leaves very little,

specifically regarding cardiovascular fitness.

The evidence that you will hear in this case is

that in preparation for his trip to Jamaica in January of '02

where he went scuba diving and golfing, he worked out every

day from January 7 to the 13th and the 15th to the 17th.

What we have done in this case is we've gone to the

1  place where he worked out, which is called Nautilus, in Erie

2  and we have obtained from them their records.  What they

3  basically do at Nautilus is track every time one of their

4  clients or gym people I guess goes into the facility.  You

5  will see the records will indicate that in 2002, he entered

6  the facility over 70 times.  And it will indicate also that he

7  entered the facility every day from the 7th to the 13th and

8  the 15th to the 17th.

9        He also indicates in a legal document which he

10  filed in 2003, he provides in that legal document a statement

11  from his then girlfriend, now wife, where she indicates that

12  she and the defendant were regularly rollerblading in the

13  summer of 2002 out on what we call Presque Isle State Park.  I

14  don't know if you guys have ever been there, if you haven't

15  you should definitely come up to Erie sometime.

16        You're going to hear not only from his current wife

17  that he was rollerblading regularly in the summer of 2002,

18  you're going to hear from several other people that they saw

19  him on Presque Isle State Park in the summer of '02

20  rollerblading.

21        Now, ladies and gentlemen, you're going to hear

22  from the Judge at the close of this case that I am not

23  required to prove a motive to you.  Motive is not an element

24  of the offenses.  That may be somewhat foreign to most jurors

25  when they first come into court who think that the government

1  has to prove a motive to you.  I don't have to prove a motive

2  to you.  But we're going to prove a motive to you and the

3  motive is this.

4          This defendant needed money and you're going to

5  find out how badly he needed money from a variety of different

6  pieces of evidence.  One is a letter he writes to Shelley

7  Buehler, his then fiance, during the course of their breakup.

8  You're going to hear it was an acrimonious breakup.  It was

9  not a good breakup.  Things went poorly.  But part of the

10  breakup involved a financial settlement because this defendant

11  and Shelley Buehler at the time they broke up owned some

12  property together and he was on the mortgage to the house that

13  she had before she started dating him.  You're going to see

14  some of these letters back and forth where they're trying to

15  reconcile their financial differences.

16          On July 18, 2002, this defendant writes Shelley

17  Buehler a letter.  Part of their settlement was Shelley

18  Buehler was telling him that she wanted in order to settle up

19  their financial affairs that he owed her $40,000.  This

20  defendant owed her $40,000.  He says right in the letter on

21  July 18, '02 that he cannot pay her a lump sum of $40,000.  He

22  wants her to accept a lesser amount at that time and then

23  maybe he can make payments.

24          This is within ten days of when he goes back to

25  State Farm and tells State Farm, I want to submit an insurance

1   claim.  It is literally a few months before he begins to

2   pursue the claim with Erie Insurance.

3            When he breaks up with Shelley Buehler and leaves

4   her residence, you're going to hear that he lives in his

5   office for several months.  This is a Superior Court judge.

6   When he leaves his fiance's residence, he does not go out and

7   get another apartment or another house.  He lives in the court

8   chambers for multiple months.

9            You're also going to hear that when the landlord at

10  the court offices finds out that the judge is living there, he

11  basically has a discussion with him about, hey, you're not --

12  the lease doesn't authorize you to live here.  He says to him

13  words to the effect of, I could lease out that space where

14  you're living right now for $800 a month.  And the defendant

15  tells him in no uncertain terms, I can't afford to pay $800 a

16  month.

17           Ultimately, he and the landlord agree on a

18  resolution where this defendant will pay $100 a month to live

19  in what amounts to a large room at his Superior Court chambers

20  building.

21           You're also going to hear that this defendant makes

22  a variety of purchases after he gets his money from the

23  insurance companies.  Within about a year, year and a half, he

24  makes these purchases that you see up here.  He ultimately

25  moves out of his one-room at his chambers, put $110,000 on a

house valued at approximately $360,000 and moves into that house.

He buys a motorcycle for slightly more than $18,000.

He puts a down payment on an airplane for $27,500.

He buys furniture for his new house for over $22,000.

He buys a home theater system for over $3,000.

He buys a hot tub for almost $7,000.

He even goes so far as to get new countertops for his new house at $6,000.

And then an engagement ring for $15,000.

We present these to you because we will argue to you at the close of the case that these purchases, along with some other additional purchases that you're going to hear about, I expect, go to his motive to commit the crime, and they provide you a window into why he really wanted the money.

One of the things we're going to ask you to keep in mind is the general timing of this case and how pieces go together.  You should consider how all of the evidence fits together from a timing perspective.  One of the things I want you to consider in this case is in 2001, he told State Farm that he wasn't going to pursue an insurance claim.  After he breaks up with his girlfriend or in conjunction with the break up with his fiance, he all of a sudden starts to pursue his

1  insurance claims.

2          Those are the types of things I'm asking you to

3  consider when you consider timing in this case.  I want you to

4  remember these things and carry these with you as you go

5  through this case because these things will have an impact on

6  the case throughout.

7          I want you to remember that you will hear evidence

8  in this case not only from the woman who hit this defendant,

9  but also from an accident reconstructionist that this accident

10  happened at less than five miles an hour.

11          I want you to remember more than anything perhaps

12  throughout this case because you're going to hear from a

13  variety of doctors that may try to convince you that he was

14  debilitated, I want you to remember his activity level that

15  you just heard about as we go through the case.  I want you to

16  remember the motive that we have presented.  That was just a

17  brief snippet of some of the motive evidence we have.

18          Also I want you to remember because it has an

19  impact on his relationship with or his interactions with the

20  insurance company the fact that this defendant was a judge

21  during the time frame involved.  That is not a fact that he

22  can get away from.  And it has a huge impact on what it is

23  that occurred in this case.  And you can see that by the fact

24  that he sent to the insurance company documents where he

25  either called himself a judge or sent it on his Superior Court

letterhead.

Now, you may be asking as jurors, how am I to determine what happened in this case?  Many of you, if not most of you, haven't been jurors before.  You may just be kind of overwhelmed.  How am I -- what am I supposed to do to figure out what happened here?  Judge Cohill gave you a pretty comprehensive rundown.  I just want to kind of highlight a few of those points.  You have some tools that are available to you that help you figure out what it is that happened here.  Because, as Judge Cohill said, you guys are the judges of the facts.  You and you alone are going to determine what the actual facts are here.

You do that a variety of different ways.  One of the ways you do that is by assessing the credibility of the witnesses.  You can do that very simply in a number of different ways.  You can see the demeanor in which they testify.  You can judge for yourselves whether they are evasive, they want to answer questions, or whether they seem like they're trying to be as honest as possible and as straight as possible.  You can look at their body language. You can obviously evaluate what it is they say.  You can evaluate whether they have a bias or don't have a bias.

One of the most important things I want you to consider though is your common sense.  Always evaluate everything that you hear from the witnesses through the prism

1    of your own common sense.  Does this make ordinary, common

2    sense what this witness is saying?  Is it believable on its

3    face?  That perhaps is the best tool that you have.

4            Another great tool is to determine is there

5    corroboration for what this witness says?  Corroboration is

6    just our fancy legal way of saying is the testimony of one

7    witness supported by a piece of evidence or by the testimony

8    of another witness?

9            There are going to be a variety of pieces of

10   evidence.  A lot of documents in this case.  You're going to

11   hear from a number of different witnesses.  This case is going

12   to last several weeks.  So we ask you to try and track for

13   yourselves the ways in which the testimony of one witness is

14   supported by the testimony of another witness.

15           I also want you to bear with us just from a

16   scheduling standpoint a little bit because there are a number

17   of professional witnesses and a number of witnesses from Erie

18   that we have to get in here in front of you to testify.  As

19   you can imagine when you're talking about 25, 30, 35

20   witnesses, it can become difficult to schedule witnesses.  We

21   may not be presenting evidence in a perfect chronological

22   order.  We ask you to keep that in mind and bear in mind we

23   have some competing schedules at work.

24           You can consider the evidence in this as with any

25   case, whether it's a civil or a criminal case, as a puzzle.

1   All your job is and what you and I will do together when the
2   case comes to a close is put the pieces of the puzzle
3   together.

4          What is beautiful about a puzzle is each piece
5   supports other pieces.  You and I together at the close of
6   this case will put the pieces of the puzzle together.  We will
7   show you that what this defendant said in the Narrative
8   Statement of Damages was not within 1,000 miles of the truth.
9   And at the close of the case, I will ask you to find him
10  guilty as charged.  Thank you.

11          THE COURT:  I think this is a good time to break
12  for lunch, ladies and gentlemen.  So we'll recess today at
13  this time, twelve-fifteen, almost, and reconvene at quarter of
14  two.

15          I think you probably all know when you come back,
16  go up to the jury room and you'll be called down at the
17  appropriate time.

18      (Whereupon, there was a recess in the proceedings.)

19          THE COURT:  Some of our jurors do have note pads,
20  but they have been instructed no notes until actual testimony
21  begins.

22          Mr. Friedman.

23          MR. FRIEDMAN:  Thank you, Your Honor.

24          May it please the Court, Mr. Joyce, Mr. Leight,
25  counsel, ladies and gentlemen of the jury.  If you want to

1   know what this case is about, it's a witch-hunt, pure and

2   simple.  It's a witch-hunt.

3        There was a negotiated insurance settlement between

4   Mr. Joyce and two of the largest companies in the United

5   States of America, State Farm Insurance Company and Erie

6   Insurance Group.  They reached a resolution of this case back

7   in 2002.  The federal government got involved in this case and

8   entered into this case four years later.  They've wasted

9   hundreds of thousands of dollars of taxpayer's money

10  investigating this case.  You know why?  Because of one

11  individual, a vicious, jilted woman by the name of Shelley

12  Buehler, the ex-fiance and girlfriend of Michael Joyce.  She's

13  an architect.  She's the architect from hell.

14       Ladies and gentlemen, this case is a very serious

15  case.  It's a criminal case, but just because she makes these

16  allegations does not give the government the right to try to

17  take down a fellow Pennsylvanian, a Pennsylvania state judge,

18  because that's what they're trying to do.

19       In a criminal case, as Judge Cohill told you and we

20  told you during voir dire examination, the government has the

21  burden of proof.  Mr. Joyce is presumed to be innocent of each

22  and every allegation as he sits here before you today, and

23  each one of you agreed with that.  The government has the

24  obligation to prove to you beyond a reasonable doubt each and

25  every element of the offense before you can even consider

1   finding Mr. Joyce guilty.

2           Whether he golfed or scuba dived, that's not the

3   issue in this case at all.  They seem to think this is some

4   sort of personal injury case where they come in and challenge

5   the personal injuries of this person and try to prove a case

6   by preponderance of evidence or not prove it.  That not what

7   this case is about.

8           There are a lot of things in this case that we

9   certainly don't dispute with the government.  No. 1, there was

10  a motor vehicle accident.  These aren't even issues that you

11  have to consider.  They're not issues in the case.  They're

12  givens.  There was a motor vehicle accident back on August 10,

13  2001.  Amber Cooper ran into the back end of Michael Joyce's

14  car.  That's a given.  That's not in dispute.

15          Mr. Trabold had to tell you it was a Mercedes-Benz

16  that he was driving, and it was.  You know why he told you

17  that?  Because he wants to build in your mind a little bit of

18  prejudice toward Mr. Joyce because he's driving a

19  Mercedes-Benz.  We know it.  You know it.  Put that aside.

20  Let's deal with the facts, Mr. Trabold.

21          The second thing is, Mr. Joyce had a cervical

22  fusion in his neck.  He had C5-6, C6-7 fused in 1992.  That's

23  a given.  Did you ever hear that from the government?  Did

24  they ever mention that to you?  Not a word.  Not a word.

25          The next thing that's not in dispute is that there

was an insurance settlement with State Farm Insurance Company,
of $50,000.  Not in dispute.  It's a given.

He settled with Erie Insurance, his own carrier --
we'll talk about that -- for $390,000.  That's not in dispute
either.

It's not in dispute that after he was involved in
this accident that he rollerbladed.  It's not in dispute that
he went to Nautilus.  It's not in dispute that he golfed.  And
it's not in dispute that he scuba dived a year and a half
later.  We don't dispute any of that.  They didn't have to run
down to the Caribbean and dig that up or run out to Nautilus
and do all that stuff.  All they had to do was ask.  We didn't
dispute any of that.  He can't do it the way he did before,
but he certainly didn't cut off his activities.  He's never
taken the position that he's totally debilitated and can't do
anything.  Never said that at all.

It's not in dispute that he flew an airplane, that
he took flying lessons.  That is not disputed.  He took them
out at Erie International Airport in the middle of the day a
hundred yards from where the accident happened.  He wasn't
trying to hide anything.

It's not in dispute that he received this money and
went out and bought various items.  He put the $300,000 into
his account.  That's a given.  All they had to do was call,
call the company, there it is.  That wasn't disputed.  It's

1   not disputed that he bought a house or bought an airplane or

2   paid off a line of credit.  None of that is in dispute.

3           Ladies and gentlemen, it's not in dispute that he

4   was injured in this motor vehicle accident.  Mr. Trabold told

5   you that the medical evidence in this case is irrelevant,

6   let's not even talk about it.  That's what this case is about.

7   The determination that you have to make and the issues that

8   are here for you to decide are whether or not Michael Joyce

9   believed that he was injured in the accident.  And they have

10  to prove that beyond a reasonable doubt not only that he

11  wasn't injured, but that he didn't believe that he was

12  injured.  They have to prove to you beyond a reasonable doubt

13  that he created a scheme to defraud the insurance company.

14  They have to prove to you beyond a reasonable doubt that he

15  intended to defraud the insurance company.  They have to prove

16  to you beyond a reasonable doubt that he made material

17  misrepresentations to these insurance companies with the

18  intent to defraud them, not inaccuracies, not misstatements,

19  not even exaggerations, they have to be material

20  misstatements.  That's what they have to prove to you to prove

21  mail fraud.

22          As far as money laundering, they have to prove to

23  you not that Mr. Joyce received the money and put it into his

24  accounts and spent it.  That doesn't make any difference.  Of

25  course he did that.  He admits that.  They have to prove to

1  you that he did that knowing that these were fruits of a

2  crime.  That's the real issue.  That he took that money

3  knowing that this was illegally obtained money.  Can they

4  prove that to you beyond a reasonable doubt and that he then

5  took that money and spent it?  That's what you have to decide.

6         Now, ladies and gentlemen, let's take a look at the

7  evidence in the case.  Who is Michael Joyce?  Michael Joyce

8  was raised here in Pittsburgh.  He grew up across the

9  Allegheny River on the North Side, spent the first ten years

10  of his life there.  After that, his family moved out to Butler

11  County and then up to Erie.  He graduated from Academy High

12  School in Erie in 1967.

13         After graduating from Academy, he joined the United

14  States Army and went off to Vietnam to serve his country.  He

15  served his country valiantly.  He was in combat.  Friends

16  around him were killed.  He came back from Vietnam and in his

17  head, he said to himself, I have been given a chance to live.

18  I'm going to live life to the fullest.

19         He came back to Erie, Pennsylvania, and he enrolled

20  at Penn State Behrend, spent four years there, was on all

21  kinds of athletic teams, the diving team, the swimming team.

22  He was on the soccer team.  He was on the wrestling team.  He

23  did incredibly well.  He's a very gifted athlete.

24         After graduating from Behrend, he went to work for

25  General Electric for a short period of time, and then he went

1  to law school in New Hampshire.  Graduated from law school.

2  Came back to Erie County and practiced law in a small town,

3  Northeast, Pennsylvania.  Practiced out there for a number of

4  years, got married, had two sons, Tim and Rob.  They're both

5  in their 20s at this point in time.  He worked out there for

6  about seven years.

7         Then he decided he was going to run for the Erie

8  County Common Pleas court.  He ran and actually won both

9  nominations in 1985 and became a judge of the county court.

10 He served on that court until 1997.  At that time, he was

11 elected to the Superior Court of Pennsylvania.  And what that

12 is, that's what we call an intermediate appellate court.  They

13 hear decisions that are appealed from the Common Pleas court.

14 That's a statewide court.  He ran statewide and he won.

15        He served on that court until 2007 when he elected

16 not to seek retention and he didn't seek retention because of

17 this particular indictment.  He lives in Erie with his wife

18 Joanne at the present time.

19        Ladies and gentlemen, as I said, Michael Joyce has

20 his entire life been an avid athlete.  He goes out and does

21 whatever he can.  He operates at a frenetic pace.  He's always

22 doing something.  If you define in your mind what a couch

23 potato is, he's the opposite of a couch potato.  Before this

24 accident, he did all kinds of activities.  He was an avid

25 golfer.  He was an avid scuba diver.  He was an instructor.

1   He was a master diver.  He rollerbladed.  He lifted weights.

2   He was always doing some type of activity.  That's who he was.

3          But the other side of him is he was always very

4   attuned to his health needs.  When he had a medical problem,

5   he sought out medical help.  And sometimes he would perceive

6   himself as having very serious issues when, in fact, they

7   might not have been as serious.  But what he was concerned

8   about was I have a problem, I'm going to go see a doctor, I'm

9   going to do what I can.

10          But he wasn't a complainer, ladies and gentlemen.

11  He didn't complain at all.  I told you when I started that in

12  1992 he had a cervical fusion.  This, ladies and gentlemen, is

13  a spine.  This is where your head would fit, were we to put a

14  head on here.  Those of you in the medical profession probably

15  know this better than I do.  But these are the cervical disks,

16  the top disks and this would be No. 1, 2, 3, et cetera down to

17  7.  And then below 7 are the thoracic disks, and then below

18  that are the lumbar disks.

19          In 1991, Mr. Joyce was in a motor vehicle accident.

20  As a result of that, he sustained an injury to his cervical

21  area, to his neck, right back here.

22          In 1992, he had to go in and have the disks fused.

23  He had to have disk C5 and that would be if you can see the

24  material between disk 5 and disk 6 is removed.  And the

25  material, the disk material between 6 and 7 is also removed,

1  and then these disks are fused together.

2      Mr. Trabold didn't tell you about this.  But this

3  is extremely important because once someone has their neck

4  fused what happens is they lose mobility in that area.  Then

5  every time you use and bend your neck, you place additional

6  stress on your neck both above and below the fusion sites.  So

7  what happens is, over years of doing this, over years of using

8  your neck, hyperextending it, you cause changes above and

9  below the fusion area.  And these are called degenerative

10  changes.  These may be asymptomatic for years.  You may not

11  notice anything.  But trauma on that or just age on that can

12  cause you to have all sorts of problems at the areas above and

13  below the fusion.  That's extremely important in this

14  particular case.

15      Ladies and gentlemen, let's talk about the

16  accident.  August 10, 2001.  It was a nice morning in Erie,

17  Pennsylvania.  It's August, it's not snowing yet.  That's a

18  good thing.  It will be in a couple more weeks.  Mr. Joyce is

19  on his way to work.  Mr. Trabold showed you the diagram of

20  Asbury and West 12th Street in Millcreek Township where this

21  happened.  Mr. Joyce was in the merge lane making a right-hand

22  turn onto West 12th Street.  He pulled up.  Ms. Cooper was

23  somewhere behind him.  He does not know where.  He did not see

24  her at any point in time.  The vehicle in front of him went

25  down 12th Street.  He moved up to go onto 12th Street and all

of a sudden, boom, he's hit from behind.  Never saw it.  Never
expected it.  He's rear-ended from behind.  Ms. Cooper will
testify that she was not paying attention.  In fact, what
Ms. Cooper will tell you is instead of looking forward while
she's driving her car, she's looking somewhere over in here.
And she says she doesn't just look over here and look back,
she continues to look over here and doesn't move forward
slightly, as Mr. Trabold told you, they would like her to say
that, but what she says is, I put my foot on the accelerator,
I pushed down, two seconds later I feel that.  Never saw the
car at all.  First thing I knew was boom, hit the car in front
of me.

          Pushes the accelerator, one, two, boom.  She says,
I'm only going a couple miles an hour.  She wasn't looking at
her speedometer.  She wasn't even looking forward.  She has no
idea how fast she was going.  Mr. Joyce has no idea how fast
she's going.  All he knows is all of a sudden he's hit from
behind.

          People will tell you, experts will tell you that
the speed of Ms. Cooper's vehicle was somewhere between five
and eleven miles per hour.  It really doesn't make all that
much difference because what you have is a rear-ender
situation on somebody with a pre-existing cervical condition.
He's hit from behind.

          He and Ms. Cooper then pull over into an area.

1    They exchange information.  Ms. Cooper asks him, are you hurt?

2    And he says no, or I don't think so.  He leaves.  She leaves.

3         The evidence will show that the government met with

4    her not once, not twice, not three times, they met with her

5    five times before she was able to testify to that.  You'll see

6    when she testifies that she tries to change her story, to make

7    it look as though this is no big deal, looking forward, I just

8    tapped him.  But then she has to acknowledge that that wasn't

9    true.  You'll see her on video and you can decide what her

10   credibility is like.

11        After the accident, Mr. Joyce goes to his office.

12   And he's starting to have some neck pain.  The first thing

13   that comes to his mind is, I've got this cervical fusion, I'm

14   concerned about it.  I don't know what it is.  He calls

15   Dr. McGee.  Dr. McGee is the doctor who did the cervical

16   fusion on him.  Dr. McGee says, you ought to go down to the

17   hospital to get an x-ray, which he does.

18        Then the next day he meets with Dr. McGee.  Next

19   day he goes in and meets with Dr. McGee.  He's got some neck

20   pain.  Dr. McGee looks at the x-ray and says the fusion site

21   looks pretty good, I'm not sure exactly what is causing it.

22   Let's take a further look at it.  Let's have Dr. Jageman look

23   at you also.

24        Dr. Jageman is his family doctor.  Dr. Jageman

25   takes a look at him.  They send him back for some more x-rays.

 1  He has some hip problems which are later attributed to the

 2  seat belt hitting a nerve on the side.  They decide they'll

 3  send him to physical therapy.

 4          He goes to physical therapy you'll see multiple

 5  occasions during August, during September.  He has an MRI.

 6  His complaints are the same.  It's primarily neck pain, but he

 7  has some lower back pain.

 8          They continue to investigate.  Dr. Jageman,

 9  Dr. McGee initially, then Dr. McGee retires from the practice.

10  He has a heart attack, has surgery and has to leave practice.

11  So he sends Mike over to Dr. Lyons who is an orthopedic

12  surgeon to investigate.

13          He continues you'll see multiple visits to

14  Dr. Jageman, Dr. Thomas.  Dr. Lyons sends him up to --

15  Dr. Thomas, who is a pain specialist, says, let's just try

16  this to see what has worked.  Let's do an epidural injection.

17          I don't know if any of you have ever undergone an

18  epidural, but the way that works is -- we'll go back to our

19  spine -- Dr. Thomas first sedates Mr. Joyce and then he takes

20  a needle and places it into his neck here and injects a fluid

21  into there to try to help him with the pain.  It does.  It

22  helps.  It's a painful procedure.  It's a risky procedure.

23  Mr. Joyce undergoes it because he wants to get better.  He

24  does it not once but he does it twice.  He comes back in

25  October and tries that again.

1          Mr. Joyce's problems, you'll see they wax and they

2     wane.  They get a little better, but they still continue to

3     bother him.  His primary complaint is always in his neck.  But

4     he does have lower back pain and he does have some memory

5     issues which he talks about with his doctors.  His doctors

6     attribute that to a possible head trauma to anxiety from this.

7     But he goes on to treat, and you'll see, he continues to treat

8     through October, through November.  Dr. Thomas does the next

9     epidural, decides to send him back for another round of

10    physical therapy which he begins in November of 2001, Hand and

11    Arthritis Rehabilitation.

12          He does 15 sessions of physical therapy there.  And

13    then in the fall -- in the spring he continues.  In January,

14    they send him to Dr. DeMatteis.  Dr. DeMatteis is a

15    neurologist.  Mr. Joyce is exhibiting radicular complaints in

16    his hand and they attribute that to the nerves in his neck.

17    They're concerned about the area above and below the fusion

18    site.  So they send him for an EMG and the EMG comes back and

19    confirms that he's having these radicular symptoms, confirms

20    possible nerve injury.

21          He's also having and he has developed these about a

22    month after the accident, these things that are called

23    fasciculations.  What those are, they're switching of the

24    nerves.  They're primarily in his legs, but they also appear

25    in his arms at times.  He becomes very concerned about this.

 1    One of his doctors says to him, these are related to the

 2    accident.  We're not sure exactly what is causing it, but it's

 3    something that we need to look into.

 4           Dr. DeMatteis addresses that with him to try to

 5    determine what it is.  One of the things that comes out as a

 6    possibility is Lou Gehrig's disease because Lou Gehrig's

 7    disease involves these fasciculations.  Dr. DeMatteis does not

 8    think it's Lou Gehrig's.  Dr. Jageman does not think it's Lou

 9    Gehrig's disease.  They send him up to the Cleveland Clinic

10    because there's an expert to determine whether or not it

11    really is Lou Gehrig's disease.  As it turns out, it's not Lou

12    Gehrig's disease.  He's concerned about it, but it's not.

13           That concern continues, though, even up into 2004.

14    He goes back to Dr. DeMatteis with a fasciculation issue.

15    This is well after the cases are settled.  He's still

16    concerned about the possibility of having Lou Gehrig's disease

17    even in 2004.  His doctors again confirm to him that he does

18    not in fact have Lou Gehrig's disease.

19           In the summer of 2002, he finally is sent to one of

20    the best radiologists in the Erie area, Dr. Carol Lyons.  He

21    has had a number of MRIs.  Dr. Lyons does another MRI to try

22    to figure out what is still causing his neck problems and

23    lower back problems.  What she finds on an MRI is he has

24    bulging disks in his lower back at L4-5 which is touching on

25    the spinal cord.  She also finds that above his fusion site at

1   C3-4 and C4-5, he's got foraminal narrowing.  What that is, if
2   we go back to our spine again, in this particular area, this
3   is where the nerves come out of the spinal cord.  She finds
4   that that particular area is narrowed and as a result of that
5   narrowing, there is encroachment on these nerves.  And what
6   the doctors attribute the cervical pain is to that particular
7   encroachment.  That's the best explanation that they can come
8   up with in terms of a cervical discomfort.

9          In the summer of 2002, Mr. Joyce files a liability
10  insurance claim with State Farm Insurance.  Initially, he had
11  no intentions, as Mr. Trabold told you, of filing the claim.
12  But after he goes through all this treatment, all this pain,
13  all this discomfort, he elects to file a claim with State Farm
14  in the summer of 2002.  Now, those of you who aren't familiar
15  with liability claims, the way it works is everybody who has a
16  motor vehicle in Pennsylvania has to purchase liability
17  insurance.  What that does is that provides coverage in case a
18  person is negligent in a motor vehicle accident.  If the
19  person that's injured is not at fault, and surely Mr. Joyce
20  was not at fault, there's no dispute about that, they have the
21  right to recover certain damages in the automobile accident.
22  They have the right to recover damages for pain, for
23  suffering, for inconvenience, for the loss of life's
24  pleasures.

25          He files the claim with State Farm Insurance

1   Company.  They say to him, as they do in every case, we want

2   to look at your medical records.  So, he signs a medical

3   authorization for them.  The case is assigned to an adjuster

4   named Bill Burt, one of their senior adjusters.  He obtains on

5   his own the medical records from every single doctor that

6   Mr. Joyce had seen, every single one.

7          Ladies and gentlemen, this is the State Farm file

8   that he develops.  He goes through and does a complete

9   analysis of Mr. Joyce's injuries.  He looks not only at the

10  medical records, but he looks at photos of the car.  He looks

11  at everything.  Does an investigation of the case.

12         What is recoverable, as I said, are all those items

13  of damages.  In addition to that, he knows that individuals

14  have the right to get damages for what is called aggravation

15  of a pre-existing condition.  In other words, in Pennsylvania,

16  and in every state, you have to take the person that's injured

17  as you find them.  If it's a person that has a pre-existing

18  injury and is vulnerable to injury, then the person that hits

19  him has to pay damages.  You can't say, well, it was an older

20  woman that got hit, had it been a young person, she wouldn't

21  have been injured so I don't have to pay her.  You have to

22  take the person as you find them.

23         What Mr. Burt says is we have this clear cervical

24  injury back in 1992.  We have a fusion.  We have injury above

25  and below the fusion.  Mr. Burt decides on his own that the

case exceeds the value of the limits of $50,000.  Mr. Joyce

doesn't even make a demand.  Mr. Burt reviews the files,

reviews the records, contacts Mr. Joyce and says, we believe

that this case exceeds the value of the policy limit and he

offers $50,000, which Mr. Joyce accepts.

Mr. Joyce then has to go to Erie Insurance, his own

carrier.  He has an underinsured motorist policy with Erie

Insurance.  What that is is whenever you buy insurance, you

can buy underinsured motorist protection.  That protects you

in case you're in an accident.  He had bought this years

before, had paid premiums for it and had purchased it with

Erie Insurance, $500,000 of underinsured motorist protection.

What that did was, that, in effect, supplied Ms. Cooper with

an additional $500,000, which she didn't buy on her own.  She

was not responsible enough to buy that on her own.  He bought

it.  And it was his coverage.  Erie Insurance then has the

obligation to do their own investigation of the accident.

Mr. Joyce before he can settle with State Farm has

to have Erie's consent to settle.  So he contacts Erie and

says, I have an underinsurance policy with you.  I need your

consent to settle.  And they say to him, that's fine.  You can

settle.

At about this time, this is August of 2002, this is

about a year after the accident, Mr. Joyce is at the

Waterfront restaurant in Erie.  This is a bar restaurant

that's frequented by many people who work in the downtown area
of Erie.  During our summer months, which aren't very lengthy
in nature, a lot of people go there on Fridays or during the
week for happy hour.  Mr. Joyce was there.  Mr. Joyce ran into
a few of his friends, people that he was very familiar with
who worked at Erie Insurance.  One of them was Ted Miller.
Mr. Miller is an attorney with Erie Insurance.  He was there
with a number of people.  Mr. Joyce sat down with Mr. Miller
and with the rest of them and during the course of the
conversation, the claim came up with Mr. Miller.

The following day, Mr. Joyce sends a letter to
Mr. Miller and Mr. Trabold showed you that.  He sent an
official letter saying I'm submitting a UIM claim to Erie
Insurance.  This is what anybody would do.  This is typically
what is done in these types of cases.

What he also does is he writes a little note to
Mr. Miller and says, enclosed please find -- and he picks up a
piece of stationery to write it on which says Superior Court
of Pennsylvania.  Mr. Trabold makes a big deal out of the fact
that he used that piece of stationery.  Mr. Miller has known
Mr. Joyce for over 30 years.  He knows he's a judge of the
Superior Court.  He knew it before he got this stationery.  He
knew it after the stationery.  The stationery is meaningless.
It's totally meaningless.  Mr. Miller gets that.  Erie
Insurance gets the claim.  They then assign it to their most

1   senior adjuster, fellow by the name of Ron Habursky.

2           Mr. Habursky does what he's supposed to do.  He

3   acquires all of Mr. Joyce's medical records.  He develops a

4   file in this case.  This is Mr. Habursky's file.  This is what

5   he develops.  Medical records.  Mr. Trabold says to you, don't

6   worry about medical records, don't worry about medical

7   treatment.  That's what the case is about.  Mr. Habursky does

8   a complete review of the file.

9           Now, an underinsured motorist claim is much

10  different than a liability claim.  Underinsured coverage is

11  coverage that's purchased by you.  It's coverage that was

12  purchased by Mr. Joyce.  Mr. Joyce paid for that coverage.

13  Erie Insurance has a duty because its their insured they're

14  dealing with, and they treat these cases very differently.

15  The other difference is if an agreement cannot be reached on

16  underinsured coverage, it goes to arbitration, not to a jury

17  trial.  Liability coverage would go to a jury trial.  So what

18  adjusters have to do when they decide whether or not to settle

19  the case is, they have to look at the file, evaluate it and

20  then decide what is this file worth?

21          Mr. Habursky knows that if they can't come to an

22  agreement, the case is going to go to arbitration.

23  Arbitrators are three lawyers, one is appointed by Mr. Joyce,

24  one is appointed by Erie Insurance, the third is appointed by

25  the two of them.  So you have three arbitrators.

Typically, arbitration awards are much higher than jury awards because you're dealing with three lawyers, and Erie Insurance knows that.  Erie Insurance knows that Michael Joyce is a judge.  They take that into account the same as they would take into account regardless of whoever it is.  They have to know the plaintiff to evaluate the case.

They look at the case.  They're aware of the pre-existing injury.  They're aware of the treatment that Mr. Joyce has had.  They're aware of the various diagnoses that have been made and they decide that the case is worth somewhere between three and $500,000 based upon their evaluation.

Mr. Habursky has authority to try to negotiate a settlement with Mr. Joyce.  He meets with Mr. Joyce.  They go back and forth.  They negotiate and eventually they reach an agreement to settle the case at $390,000.  About $110,000 less than the insurance coverage that was available.

Case is closed.  Erie is satisfied.  State Farm is satisfied.  Mr. Joyce is satisfied.  Should be the end of the case.  But it's not.  Four years later, the federal government gets involved as a result of Ms. Shelley Buehler.

Ladies and gentlemen, Mr. Joyce is not perfect.  The biggest mistake he made was representing himself in his claim.  He should have had a lawyer represent him, but he didn't.  He sat down and wrote that 18 or 19 page document to

Erie Insurance.  He's living with these injuries.  He's not

objective about it at all.  He sits down at a computer and

starts to type.  Mr. Trabold is exactly right.  The statement

that he sends is verbose, it's lengthy, it's conflicting, it's

got inaccuracies.  It isn't done after reviewing medical

records.  It's just someone sitting at a computer state of

mind typing this thing out.  Is it 100 percent accurate?  It's

not.  Did it have anything to do with settling this case?  No,

it did not.

Let's talk about what Mr. Trabold talked to you

about because he sees this case as a case whether or not

Mr. Joyce could golf or not, or dive or not.  It's not about

that.  It's not about that at all.

As I told you before, Mr. Joyce is an avid athlete.

He goes out and he does things.  If they hurt when he does it,

he does it until he can't take it anymore and he pays for it

later on.

He takes medication so that he's able to do it.  He

is not somebody that is going to sit back and let this get him

down.  He never told anybody he was an invalid as a result of

this accident.  What he said was, I have been injured.  There

are certain things I can't do as well.  There are problems

that I have and I'm entitled under Pennsylvania law to be

compensated.  That was the agreement that was reached with the

insurance company.  He said in his letter -- Mr. Trabold

talked about this -- that he was having difficulty golfing.
At one point he said he had difficulty finishing rounds.  He
talked about golfing several times during this period of time.
He talked about golfing five times during this period of time.
He did golf a number of times during the period beginning in
January of 2002.  He did not golf between the time of the
accident in August 2001 until January of 2002 when he
attempted to golf.  Some of those golf games he walked off the
golf course in the middle of the games because of the pain.
Sometimes he had to pick up a ball and knock off a couple of
tees.  They obtained the records from the golf association
which have scores on them.  Those of you who know that you
have to submit a score after you have completed 11 or 12
holes.  I'm not a golfer.  That's what they told me.  That's
what he did on a number of occasions.  What is really
important and what the government didn't tell you was as of
July 2002, he quit golfing because of the pain.  He stopped
all together.  And that's not in dispute.  What they want to
dispute is the number of times he golfed before that.  They
don't want to talk to you about why did he golf up until July
of 2002 before he settled this case and never golfed again.
He belonged to Lake Shore Country Club.  He quit.  He wrote a
letter and said, I can't golf anymore because of my injuries.
I'm done.  With all the thousands and hundreds of thousands of
hours they spent on this case, there is nothing that they can

present to you to show that he golfed after that.

He was done scuba diving.  Mr. Trabold spent a lot of time talking about scuba diving.  Scuba diving was incredibly important to him before this accident.  He is a master diver and a diving instructor.  This has taken him hundreds of hours to learn to do this.  He takes people and trains them to be scuba divers.  Every year he would go on dives to the Caribbean.  He would go and he would dive from boats.  He would dive on multiple occasions.  He did not dive from the time of the accident until the time of the settlement.  He dove after that, but the diving was much different.  The diving that was done after that were beach dives, not boat dives, and they weren't multiple dives, multiple dives like he used to do.  One time he even went and had an epidural needle stuck in his neck before he went to dive.  He would take medication because he loved it so much. He would try it and he would do it with pain.  Did he dive? Of course he dove afterwards.  He tried to dive, but not the way he used to dive.

Mr. Trabold talked to you about the certification. In the letter he said he was not certified as an instructor after this.  Well, I can tell you what is a given is he never instructed anyone after this again.  After this accident, he never ever instructed again.

Did he send his form in?  Yes, he did.  He sent the

1  form in, but what he didn't do was he didn't renew his

2  liability insurance.  And in order to be a certified

3  instructor, you have to do both.  His liability insurance

4  expired.  He did not renew it.  Mr. Trabold knows that.  He

5  didn't mention it to you.

6          Supreme Court.  You'll recall that Mr. Joyce said

7  he had the nomination to the Pennsylvania Supreme Court.

8  Let's talk about this a little bit because it's important.

9          Mr. Joyce is a republican.  I'm a democrat.  I

10  don't understand their process.  When democrats run for

11  courts, they line up 15 candidates, they all run off to the

12  finish line to see who is going to get the nod in the primary

13  election.  They beat each other up, somebody gets the nod in

14  the primary, runs in the general and usually loses.

15          Republicans are much more organized.  What they do

16  is they work it out in advance.  Before they even get to the

17  primary, everybody else drops out, so at the primary they

18  don't have to spend much money.  They have one candidate, if

19  there's one opening, and that candidate goes on to run in

20  November and has more assets to run.  Republicans are much

21  more organized.

22          In 2000 Mr. Joyce decides he's going to run for the

23  Supreme Court of Pennsylvania.  Let me tell you, the Superior

24  Court is below the Supreme Court of Pennsylvania.  Everybody

25  on the Superior Court thinks they ought to be on the Supreme

Court.  As soon as they're elected to Superior Court, the next
thing in their mind is how do I get to the Supreme Court.
There are 15 of them and they are always jockeying to see who
is going to run.

Mr. Joyce was a tremendous candidate for Superior
Court in 1997.  He was the No. 2 vote getter out of eight
candidates.  Coming from Erie, Pennsylvania, that's not easy.
Most votes aren't in Erie, Pennsylvania, they're here in
Pittsburgh or in Philadelphia.  So when people run from Erie,
they have to travel all over the state.  They have to work
incredibly hard and as republicans, they have to depend on
votes in the public areas which are all over the state, not
just in Pittsburgh and Philadelphia, which is primarily
democrat.  Mr. Joyce ran in 1997 and he ran hard and he won.
He came in second.  He won big.

In 2000 he decides he's going to run for the
Supreme Court of Pennsylvania.  There are several other
republican judges from the Superior Court that are interested
in running.  Now, remember, the accident happens in 2001,
August of 2001.  This race takes place at the end of 2000 and
then the primary takes place in the spring of 2001.

The way the republican process works is candidates
decide if they're interested and then they appear for various
meetings of the leadership of the republican party.  That
takes place usually in January of 2001.

1          Mr. Joyce goes through that process and he comes

2     out of there with the understanding that he is the candidate,

3     that he's got the nod for the republican nomination, if he

4     wants it.  He decides not to run.  It has nothing to do with

5     his accident.  The accident hasn't even happened yet.  He

6     doesn't run because his mother is ill and he drops out.

7          He says to himself, I'm going to take another shot

8     at it in 2003.  I'll see what happens, but it's my intention

9     now to at least take a shot in 2003.  I may not get the

10    nomination in 2003.  I may get the nomination and lose the

11    election, who knows.  Politics change on an hourly basis.  But

12    it is his intention to take a shot when the next vacancy comes

13    up in 2003.

14         What he says to Erie is, hey, when I have this

15    accident, I can't drive the way I have to be able to drive to

16    campaign.  I can't put 50,000 miles on my car in a year.  I

17    can't drive out to Warren and back.  I can't drive to

18    Harrisburg and back.  All these things have to be done to run.

19    Because of my injuries, I can't drive a car.  Sure I can drive

20    a car.  I can get into an airplane and fly, but I can't do

21    that kind of thing.  So, I am not going to run because of this

22    accident.  And, if that's something that the jury or the

23    arbitrators or the insurance company want to take into

24    account, certainly they can because that's a loss of life's

25    pleasures.  They can discount that entirely if they want.  The

1    insurance company can say, we don't know if you're going to

2    win, Mr. Joyce.  We don't know if you're going to run in 2003

3    regardless of the accident.  We're not going to take that into

4    account or they can take that into account.  Insurance

5    carriers do that every single day.  Mr. Joyce said in his

6    letter that he had the nomination.  He did not.  He thought he

7    was going to get it, but he didn't have it.  But, the

8    insurance company knew he didn't get it.  It's a matter of

9    public record, all they had to do was pick up the newspaper.

10   They knew who was nominated and won the nod.  The election was

11   already over by the time Mr. Joyce filed his claim.  It's just

12   a red herring.

13          Mr. Trabold spoke to you about rollerblading.  Erie

14   Pennsylvania, we have a state park.  Mr. Trabold invited you

15   up.  I will do the same.  Presque Isle State Park is Erie's

16   biggest attraction.  It's flat.  It's beautiful.  It's on the

17   beach.  This is where we go to socialize as people living in

18   Erie in the summer months.  It gets us out of the house.

19   There are paths out there.  This isn't competitive

20   rollerblading by any stretch of the imagination.  Did

21   Mr. Joyce go out and rollerblade?  You bet he did.  He went

22   with other people.  This is one of the most public areas in

23   Erie.  This was no attempt to hide this.  None whatsoever.

24   There's nothing wrong with it.

25          Did he go to Nautilus?  Absolutely.  That's the

first thing doctors tell you to do, get moving, exercise, do
something.  He wasn't doing the things that he was doing
before the accident, but was he going to Nautilus?
Absolutely.  He was going to Nautilus.  No question about it.

Flying.  Ladies and gentlemen, in the spring of
2002, Mike Joyce decides that he was going to learn how to
fly.  The reason he did it was he felt he's now restricted in
some of the athletic stuff that he'd like to do.  So he
decides he's going to try to fly.  I can tell you, flying is
like driving a car.  It doesn't take a Herculean effort and it
don't take intense concentration.  It's not like sitting
reading briefs, digesting briefs, digesting opinions.  It's
something you get in and you learn to fly.  He did.  He
definitely did.  He never tried to hide that from anyone.  He
was very public about it.  He went to the airport located by
his office near the airport in Erie, Pennsylvania, and he
learned how to fly.

Now, what did he do in terms of that FAA form that
Mr. Trabold talked to you about?  Mr. Trabold told you he
filled out this FAA form on April 8, 2002, and he did.  Down
here they asked him to list all the doctors that he had seen
in the last three years.  He lists only the person that did
his gallbladder surgery, Dr. Wardan.  Up here they ask for
medications.  He didn't list those.  There is also a block
here about neurological disease.  This is not accurate.  I can

1   tell you it's not accurate.  Mr. Joyce isn't here on trial for

2   this form.  He should have checked the box.  He should have

3   filled in that information.  No question about it.  But that's

4   not what this case is about at all.  Know why he filled that

5   out the way he did?  He wanted to fly.  Next year or two years

6   later he filled out the form the same way.  He wanted to fly.

7   Was he wrong?  Should he have been more accurate in that form?

8   Absolutely he should have been.

9          Ladies and gentlemen, the medical evidence in this

10  case is clear.  Mr. Trabold told you to ignore the medical

11  evidence, that it wasn't important.  And the reason he told

12  you that is he doesn't want you to look at the medical

13  evidence.  He wants you to look at golf things, scuba diving

14  and all these things that he thinks are inconsistent.

15         But the important thing is the medical evidence.

16  Insurance companies will tell you, and many of you know this,

17  that's what they focus on.  That's what is in his files.

18  That's how they evaluate a claim based upon the medical

19  evidence.

20         The medical evidence in this case will show that he

21  had this prior cervical fusion.  It will show that there were

22  degenerative changes above and below the fusion.  It will show

23  that there was encroachment on his nerves and it will show

24  that he had pain.  He had neck pain.  He had back pain.  The

25  MRI shows a disk, a lumbar disk as well as this.

1    Unquestioned.  It's there.  Unquestioned he had pain.

2    Unquestioned he didn't tell you about it because he didn't

3    want you to know about it.

4            Ladies and gentlemen, did he have fasciculations?

5    Did he have these little twitching things?  He did.  The

6    doctors saw him.  He didn't know where they came from.  He

7    didn't have them before the accident.  He got them after the

8    accident.  Doctors told him it was from the accident.

9    Probably no big deal.

10           But one of the things he was concerned about was

11   the Lou Gehrig's disease.  Lou Gehrig's disease is not caused

12   by motor vehicle accidents.  Nobody ever suggested that to

13   anyone.  Was he able to function with these things?  Of course

14   he was able to function.  Did it weigh on his mind, maybe I do

15   have Lou Gehrig's disease?  Yeah, it did.  It would weigh on

16   anyone's mind.  That's why he went to the Cleveland Clinic to

17   check it out.  If he's just doing that because of the

18   settlement, why in 2004 does he go to Dr. DeMatteis saying, I

19   still have these fasciculations.  Do I have Lou Gehrig's

20   disease?  He's concerned about it.  Is the concern realistic?

21   I don't know.  I don't know.  If you had it, maybe you

22   wouldn't think so.  Maybe some of you would.  But it's a

23   horrible disease and he was worried about it.  Who is going to

24   fault him for that?

25           What is clear, what is clear in this case and what

the evidence will show is that Michael Joyce was rear-ended in
a motor vehicle accident.  He didn't see it coming.  He
doesn't know how fast the person hit him.  But he was hit from
behind through no fault of his own.  What is clear is that he
had injuries as a result of that accident.  What is clear is
that it impacted him.  The degree of how it impacted him, we
can argue about from here to the moon, but it impacted him.
And he believed he was injured.  He was injured.  He did not
intend to defraud anyone.  There is not evidence of any scheme
to defraud.  There is no evidence of an intent to defraud.
There is no evidence of money laundering.

        At the end of this case, you all are going to have
to take all of the evidence and put it together.  Mr. Trabold
talked about a puzzle.  It is a puzzle.  The government has to
put that puzzle together for you and convince you beyond a
reasonable doubt that this man committed these crimes and they
can't do it when they take pieces of the puzzle and put them
in their pocket.  The cervical fusion.  He doesn't want you to
take a look at that.  He doesn't want you to consider the
medical records.

        Ladies and gentlemen, use your common sense, but
remember, this case is extremely important to this man, to
this man's family.  I know you'll do the right thing and at
the end of this case, you'll find him not guilty of these
charges.  Thank you.

 1            THE COURT:  Looks like a good time for our
 2   afternoon break, ladies and gentlemen.  We'll reconvene at
 3   three o'clock.
 4       (Whereupon, there was a brief recess in the proceedings.)
 5            THE COURT:  Mr. Trabold.
 6            MR. TRABOLD:  Your Honor, the United States calls
 7   Dr. Robert Shields.
 8            THE COURT:  Come forward and be sworn, please.
 9       ROBERT W. SHIELDS, JR., M.D., a witness having been duly
10   sworn, testified as follows:
11            THE COURT:  Have a seat up there.  Give us your
12   name and spell your last name.
13            THE WITNESS:  My name is Robert W. Shields, Jr.,
14   S-H-I-E-L-D-S.
15                      DIRECT EXAMINATION
16   BY MR. TRABOLD:
17   Q.  Sir, where are you employed?
18   A.  I'm employed at the Cleveland Clinic in Cleveland, Ohio.
19   Q.  What do you do there?
20   A.  I'm a neurologist.
21   Q.  Can you explain to the ladies and gentlemen of the jury
22   what a neurologist -- what you do medically?
23   A.  Yes.  A neurologist is a subspecialty of medicine that
24   deals with diseases of the nervous system, the brain, the
25   spinal cord and nerves and muscles.  So, a neurologist

1    diagnoses and treats these conditions.

2    Q.  Can you tell us what the autonomic lab at the Cleveland

3    Clinic is.

4    A.  The autonomic lab deals with the autonomic nervous system.

5    It's another part of the nervous system that controls heart

6    rate, blood pressure and other functions of the body and we

7    have a laboratory there that does special tests to diagnose

8    these conditions.

9    Q.  In your capacity as a neurologist at the Cleveland Clinic,

10   did you have the opportunity to examine and have an

11   appointment with a person by the name of Michael Joyce?

12   A.  Yes, I did.

13   Q.  Did that occur on May 3rd of 2002?

14   A.  That's correct.

15   Q.  Can you share with the ladies and gentlemen of the jury

16   your recollection of how it is that Mr. Joyce came to see you.

17   A.  My recollection is really based on my clinical notes

18   because I don't have an independent recollection of that

19   visit.  I have to kind of reconstruct it from my notes at that

20   time.

21        He was referred by Dr. DeMatteis for an opinion

22   about fasciculations and other neurologic symptoms he was

23   experiencing.

24   Q.  You mentioned your notes and I want to show you now what

25   I've marked as Government's Exhibit No. 53.

1           MR. TRABOLD:  Your Honor, just so you're aware,

2    obviously, we were forced essentially by virtue of conflicting

3    schedules to take witnesses out of order.

4           THE COURT:  This is 53?

5           MR. TRABOLD:  53, Your Honor.

6    BY MR. TRABOLD:

7    Q.  Let me show you that and ask you to identify it.  That is

8    Exhibit 53.

9    A.  This is a letter that I wrote to Dr. DeMatteis after my

10   consultation with Judge Joyce on May 3rd, 2002, which included

11   the history, the examination and the results of testing that

12   we performed at the Cleveland Clinic, and then my conclusions

13   and recommendations.

14   Q.  Let me just back you up for one second.  You mentioned the

15   medical term fasciculations.  That's part of the reason why

16   you saw Mr. Joyce.  Could you explain to the ladies and

17   gentlemen of the jury what a fasciculation is.

18   A.  A fasciculation refers to a painless, isolated muscle

19   twitch or a muscle might twitch or jump on its own.

20   Q.  Now, Mr. Joyce comes in to see you.  Prior to actually

21   sitting down and undergoing examination from you, does he

22   undergo some testing?

23   A.  Yes.

24   Q.  What would the testing of Mr. Joyce have consisted of?

25   A.  He underwent some laboratory tests, a blood test and an

1    EMG test.

2    Q.   Let's take the blood test first.   Why is it that you would

3    have drawn blood from Mr. Joyce and tested it?

4    A.   Basically, to look for some common and very treatable

5    conditions that might cause symptoms that he was experiencing.

6    Q.   The EMG, can you explain to the ladies and gentlemen of

7    the jury what an EMG -- first of all, what it is, and then why

8    you do an EMG?

9    A.   An EMG, it stands for electromyography.   It's a test

10   that's designed to help diagnose nerve and muscle conditions,

11   conditions of the nerves that run in the arms and legs and the

12   muscles.

13          It consists of two parts.   The first part is a

14   nerve conduction test where electrodes are placed over nerves

15   and muscles in the arms and legs and a stimulator is used to

16   stimulate a nerve.   Typically, around the wrist or the elbow

17   in the arm.   Typically, at the ankle or the knee in the leg.

18   The nerve is stimulated and we measure the response of the

19   nerve.   So it's a way of detecting problems that affect the

20   nerves that run in the arms and legs.

21          The second part of the test is the needle electrode

22   exam.   That part of the test involves taking a special pin

23   electrode and inserting it into various muscles and measuring

24   the electricity that the muscle is generating.

25          We examine and design the test according to the

1   nature of the problem that we're addressing, and we combine

2   both the results of the nerve conductions and this needle

3   electrode examination together to form a conclusion as to the

4   nature of what we learn from the test and what it means

5   clinically.

6   Q.  Now, as a result of the -- after he undergoes the testing,

7   does he then have an evaluation performed by you?

8   A.  Yes.  I'm not actually clear how the sequence was on that

9   particular day.  My notes -- as I recall, I saw him first and

10  then these tests followed.  That's my recollection, but I

11  might be wrong.

12            Typically when we see patients who are coming from

13  out of the city or certainly out of state, we prearrange tests

14  that we think would be helpful for convenience in scheduling.

15  I think, typically, I would see the patient first and then the

16  tests are scheduled afterwards so if there's a change in the

17  focus of the test, I can do that after I see the patient.

18  Q.  And with a patient coming to you for the issues that

19  Mr. Joyce was coming to you for, what is it that you do when

20  you actually examine him?

21  A.  Well, a part of my examination begins by a history, that

22  is, to interview the patient about the symptoms that they're

23  having and learn more about those.  And also ask other

24  questions about symptoms they may not be talking about but

25  would be relevant to understanding the problem.  And then

1    performing a neurological examination.

2    Q.   Did you perform a neurological examination of Mr. Joyce?

3    A.   Yes, I did.

4    Q.   What does that consist of?  What is it you actually do

5    with the patient?

6    A.   The examination assesses many different functions.  First

7    of all, there's an assessment of the patient's mental status,

8    are they able to answer basic questions and recall their

9    symptoms accurately?  It's an index of their memory and

10   ability to understand and communicate.

11        And then we move on to the cranial nerve

12   examination, which measures function of vision and eyes,

13   muscles that revolve around chewing, swallowing and talking.

14   These are called the cranial nerves.

15        Then, typically, we do a motor system exam, which

16   means inspecting the muscles over the arms and legs and chest

17   and abdomen, checking strength and tone of muscles, checking

18   reflexes, things of this sort.

19        Then the other part of the neurologic examine is to

20   measure sensation, the ability of the patient to feel certain

21   sensations like pin or light touch or vibration and things of

22   this sort.

23        Then there's a test of coordination of the arms and

24   legs.  And then usually a test of gait, how does a patient

25   walk, are they demonstrating normal balance and coordination

1  with standing and walking.

2  Q.  Was your neurologic assessment of him essentially normal?

3  A.  Yes.  My examination disclosed a few fasciculations in

4  scattered muscles in the arms and legs.  And I don't believe

5  there were any other -- I should take a look at my notes here

6  to be sure.

7           There was a fine tremor of the outstretched hands a

8  little more prominent on the right than the left, which is an

9  involuntary tremulous movement that I thought was very modest.

10  And the remainder of the exam, except for the fasciculations

11  and that tremor, I thought was normal.

12  Q.  With regard to his gait and station, was that remarkable

13  for any reason?

14  A.  I indicated gait and station are unremarkable.  And Judge

15  Joyce was able to walk on his heels and toes and perform a

16  deep knee bend without difficulty.

17  Q.  Now, did you deem the fasciculations that you found to be

18  a pertinent or significant medical finding?

19  A.  Well, at the time, I did not see any other features on the

20  examination that would make me concerned about the

21  fasciculations.  Judge Joyce did not complain at this time of

22  weakness in the arms or legs or progressive weakness.  It

23  would be a greater concern for the significance of the

24  fasciculations.

25  Q.  Can even healthy people have fasciculations?

1    A.   Yes.

2    Q.   In your report, at the tail end of your report you

3    characterize the fasciculations as benign fasciculations.

4    What do you mean by that?

5    A.   Well, again, fasciculations are important only in the

6    company they keep.  If fasciculations are associated with

7    weakness, then it can be a serious sign of an underlying

8    muscle disease or nerve disease called ALS.  But many normal

9    patients or normal subjects I should say have fasciculations

10   that are not accompanied by weakness or other features and

11   their neurologic examinations and oftentimes EMG examinations

12   are normal.  In those situations, we refer to these as benign

13   fasciculations.

14   Q.   Because they're not associated with any other medical

15   malady?

16   A.   That's correct.

17   Q.   With regard to the issue of ALS as it relates to

18   Mr. Joyce, did you deem that to be an issue involving him at

19   all?

20   A.   No.

21   Q.   Why?

22   A.   Because the fasciculations were not accompanied by

23   symptoms of weakness.  I did not find weakness on his

24   neurological examination and the EMG testing, which is an

25   extremely sensitive test for detecting underlying nerve and

1  muscle disease, was nonsupportive of the changes you would see

2  in a patient with ALS.

3  Q.  Did the EMG test reveal any significant problems with

4  Mr. Joyce?

5  A.  The EMG showed fasciculations in two muscles and some

6  chronic changes in two muscles in the arm that were

7  interpreted as consistent with a prior history of a cervical

8  spine injury for which Judge Joyce had a cervical spine

9  operation I think in 1991.

10  Q.  Now, when you use the word "chronic," what do you mean by

11  that?  What does that mean, chronic?

12  A.  Well, in terms of electromyography, which was the test

13  that was used to define this, chronic means that if a nerve

14  was injured and we're seeing the residual changes of that

15  injury, the injury would have to occur at least six months

16  before the test was done.  In that case, anything that would

17  have happened six months before, or much longer before, six

18  months or longer, we would see those changes and assume that

19  they are at least that old.  We refer to that as a chronic

20  change, not an acute or very recent change.

21  Q.  Did you notice any acute or did your testing uncover any

22  acute changes or acute problems with Mr. Joyce?

23  A.  No.

24  Q.  Can you give us a time frame as it relates to acute

25  changes, when you would expect to see those or when those

1  would be revealed?

2  A.  Well, acute changes on the EMG test are defined by

3  fibrillation potentials.  These are changes in muscle that you

4  find on the needle electrode exam.  You put this needle in the

5  muscle and you see these spontaneous discharges in the muscle.

6  And they occur approximately three weeks after an acute injury

7  of a nerve.  It goes to that particular muscle.  So, if you do

8  the test at least three weeks after a potential injury and you

9  see these fibrillation potentials, it implies that there's

10  been some acute injury to the nerve that supplies that muscle.

11  Fibrillations once they are present sometimes can last for

12  many, many years.  They don't completely go away.  Sometimes

13  they will go away three to six months later.  So it's quite

14  variable.

15  Q.  Now, in reviewing Mr. Joyce's history, did you take note

16  that he had some EMG testing close in time to mid August or

17  I'm sorry, September of 2001?

18  A.  Yes.

19  Q.  Did your review of that testing reveal the testing in

20  September of 2001 to reveal chronic problems or acute

21  problems?

22  A.  The changes were predominantly of a chronic nature in the

23  right arm, similar to what we found on our EMG test.

24  Q.  Those chronic changes would then relate to an event

25  distant in time from September 2001?

1   A.   Yes.

2   Q.   How long a period of time did you spend in Mr. Joyce's

3   presence, if you recall?

4   A.   A typical new patient visit for me is at least an hour and

5   sometimes a little longer.

6   Q.   When we -- just so the jury is clear, when we're

7   referencing ALS, is that the same thing as Lou Gehrig's

8   disease?

9   A.   Yes.

10  Q.   Now, did you detect when you examined Mr. Joyce or through

11  the testing any current or ongoing problems with him at all?

12  A.   The -- many of the symptoms that he presented with at the

13  time I saw him had resolved, and the key issue was the

14  fasciculations that he was experiencing.  I think that was how

15  I viewed this.  And I did not see anything else that would be

16  of an acute nature at that time.

17  Q.   Did you deem the fasciculations to be medically

18  significant?

19  A.   No.

20  Q.   In your exam note you make reference to a seat belt thigh

21  injury.  Can you explain to the ladies and gentlemen of the

22  jury how that found its way into your report.

23  A.   You know, I think that at the time I was interviewing

24  Judge Joyce, he mentioned that after the accident he developed

25  pain in his back and also had pain in his left thigh and an

1   area of numbness in the thigh, and he was in an accident as a

2   restrained person with a seat belt.  And I think his concern

3   was that the seat belt may have compressed a nerve in his

4   thigh.  At that time, though, those symptoms had essentially

5   resolved.  They were not active and I did not really pursue it

6   any further.

7   Q.  Did you find any medical basis for the symptoms which

8   Mr. Joyce was sharing with you?

9   A.  The only -- again, the major symptoms were the

10  fasciculations, and I think that clinically and via the EMG

11  testing, I concluded that these were benign fasciculations and

12  not related to any other nerve or muscle disease.

13  Q.  At the conclusion of your exam, did you feel as if you

14  were giving Mr. Joyce good news or bad news medically?

15  A.  Well, certainly my sense is that the results of my testing

16  was very good news.  I can't remember if I met with him after

17  the testing or not.  My letter certainly was copied to him.

18  It was addressed to Dr. DeMatteis, who was the referring

19  physician, and we always copy our communications to the

20  patient.  They get the exact letter report.  I'm not sure if I

21  actually spoke to him or not at the time of the testing.

22  Q.  Can I direct your attention to Page 2 of your exhibit.

23  I'll let you keep the one we've marked as Government's 53.  I

24  have another copy of it here to put it on the document reader.

25          Do you see that paragraph at the bottom where it

1  begins "certainly"?

2  A.   Yes.

3  Q.   Can you read that for the jury, please.

4  A.   "Certainly, Judge Joyce's neurological evaluation here has

5  been essentially negative.  I find no evidence of a

6  significant underlying neurologic disorder to account for his

7  symptoms.  I suspect that the fasciculations that he has

8  noticed represent benign fasciculations.  Clearly he has

9  residual changes from cervical radiculopathy, but there are no

10 signs of active or ongoing problems at this time.

11 Q.   Can you explain to the ladies and gentlemen of the jury

12 cervical radiculopathy?

13 A.   Cervical radiculopathy refers to a nerve being pinched in

14 the neck, usually from a disk or some type of arthritic

15 problem such that the nerve is injured and may cause pain that

16 shoots down the arm or cause weakness or numbness in the hand

17 or the arm.

18 Q.   Do you deem the cervical radiculopathy finding to be

19 chronic or acute?

20 A.   Chronic.

21 Q.   Doctor, is there any objective test medically for pain?

22 A.   No.

23 Q.   So any report of pain, would that be a subjective or an

24 objective reporting from the patient?

25            MR. FRIEDMAN:  Objection, Your Honor.

1        THE COURT:  No, I think that's a generic question.

2   We'll permit it.

3   A.  I think pain is typically a subjective symptom that a

4   patient communicates, but there is not an objective test that

5   can confirm that or to accurately measure that.  It's a

6   symptom that you simply take as a patient's complaint.

7        MR. TRABOLD:  Thank you, sir.

8        Nothing further, Your Honor.

9        THE COURT:  You may cross-examine.

10        MR. FRIEDMAN:  Thank you, Your Honor.

11                CROSS-EXAMINATION

12   BY MR. FRIEDMAN:

13   Q.  Dr. Shields, my name is Philip Friedman and I represent

14   Mr. Joyce.

15        If I understood you correctly, you have no

16   recollection of visiting with Mr. Joyce; is that correct?

17   A.  I don't have any independent recollection, that's correct.

18   Q.  Really, you're just testifying as to what's in your

19   letter; is that correct?

20   A.  That's right.

21   Q.  Now, Dr. DeMatteis referred Mr. Joyce to you, correct?

22   A.  That's correct.

23   Q.  And you're at the Cleveland Clinic, correct?

24   A.  That's right.

25   Q.  That would be one of the finest medical institutions in

1  the country, correct?

2  A.  I hope so.

3  Q.  Second to UPMC, of course.

4  A.  We're in Pennsylvania here, aren't we?

5  Q.  You're in UPMC country.

6        Dr. DeMatteis has referred other patients to you,

7  correct?

8  A.  That's correct.

9  Q.  And the reason that he referred Mr. Joyce to you was

10 because of the fasciculation issue, correct?

11 A.  That's right.

12 Q.  Mr. Joyce had the fasciculations and was very concerned

13 about them, correct?

14 A.  That's right.

15 Q.  And as far as you recall, one of the things Mr. Joyce and

16 Dr. DeMatteis were concerned about was the potential for ALS,

17 Lou Gehrig's disease, correct?

18 A.  Yes.  That's always the implication when the patients are

19 referred with fasciculations.

20 Q.  That's a scary diagnosis, correct?

21 A.  Yes, it is.

22 Q.  In fact, that's probably the scariest diagnosis that you

23 deal with, correct?

24 A.  It's one of them.

25 Q.  So when Mr. Joyce came over to see you, it was because of

his concern about the possibility of having ALS, correct?

A.   Yes.

Q.   And certainly when you examined him, you came to the conclusion that he did not in fact have ALS, correct?

A.   That's right.

Q.   That's not to say that he could get ALS in the future, you can't predict that one way or the other, correct?

A.   That's correct.

Q.   So if I understand you correctly, he comes over, you see him, take a history from him, correct?

A.   That's right.

Q.   And then you put him through various diagnostic tests, correct?

A.   That's correct.

Q.   Including the EMGs that you talked about, correct?

A.   That's right.

Q.   Now, you certainly would not have put him through that EMG procedure had you come to the conclusion that there was no chance of any ALS or any serious diseases, correct?

A.   That's right.

Q.   You wanted to check it out, right?

A.   That's correct.

Q.   And so your concern was shared with Mr. Joyce that maybe you do have something more serious than just benign fasciculations, correct?

A.   Right.  It's a very common circumstance for us to see

patients with fasciculations.  And even if there isn't any

supportive weakness or other findings on the neurologic

examination, almost invariably we do the EMG testing to either

discover that there is ALS, or to reassure the patient that

the test is negative for that disease.

Q.   Now, the EMG procedure is not a pleasant procedure, is it?

A.   No.

Q.   You said there's two EMGs, one is -- does the one involve

just putting electrodes on top of the skin?

A.   The first part, the nerve conduction studies, the

electrodes are taped or put on fingers with a little circular

type of ring and the nerve is stimulated to evoke a response.

        The second part of the test, as I mentioned, is the

needle electrode part where the needle is inserted in various

muscles and the electricity of the muscle is measured.

Q.   Just looking at the first test, is that a painful

procedure?

A.   Well, it's a shock.  It's much like -- we educate patients

about the test, we tell them it's like touching a door knob in

a dry room in the winter and you get a little static

electricity shock.  It's that kind of feeling.  Some people

are very sensitive to it, others are not.  But it's

unpleasant.

Q.   How many of those shocks would you administer in the

1  course of the evaluation, any idea?

2  A.  Well, it's hard to say.  Numerous nerves are typically

3  examined in the arm and the leg when we're evaluating for

4  fasciculations and possible ALS, so it's many, many shocks in

5  different locations.

6  Q.  Now, as far as the other test goes, that actually involves

7  putting needles in the skin; is that correct?

8  A.  That's correct.

9  Q.  And certainly that's a painful process?

10  A.  It's uncomfortable for sure.

11  Q.  How many needles were actually inserted?  Can you tell the

12  ladies and gentlemen that?

13  A.  I'm not certain, but it would be typically in the range of

14  15 to maybe up to 20 muscles were examined on average.

15  Q.  It would take 15 to 20 injections?

16  A.  Insertions.  Nothing is really injected.  It's an

17  electrode.

18  Q.  Once those are placed into the skin, are shocks then

19  administered or not?

20  A.  No.  The needle part actually goes through the skin, but

21  it's in the muscle itself and there's no shock or injection

22  for that part of the test.  The needle is in the muscle and

23  the patient is asked either relax or to activate the muscle so

24  we can see the muscle when it's relaxed and when it's

25  contracting.  And the needle is moved in different locations

1    several times during that process of examining a single

2    muscle.

3    Q.  You, in fact, did detect fasciculations, correct?

4    A.  Well, I did not perform the test.  My colleague,

5    Dr. Levin, did, and he reported that there were fasciculations

6    in two muscles during that examination.

7    Q.  You indicated also when you did the examination of him

8    that he had a tremor in his hand; is that correct?

9    A.  Yes.

10   Q.  Now, Doctor, in your clinical findings in your letter, you

11   indicate that there are clinical features suspicious for a

12   partial injury of the lateral femoral cutaneous nerve of the

13   left thigh?

14   A.  Yes.

15   Q.  You thought that that was most likely related to a seat

16   belt injury; is that correct?

17   A.  Yes.  I think that those symptoms in that distribution

18   would correspond to a lateral femoral cutaneous nerve and I

19   think that Judge Joyce expressed concern from something he may

20   have experienced at the time of the accident that it was the

21   seat belt that may have dug into his proximal leg or groin

22   area that may have caused it.  There must have been some

23   injury at that time for me to speculate about it at that time.

24   Q.  Now, you also indicated on direct examination that you did

25   find radicular symptoms; is that correct?

A.   There were no symptoms in terms of his complaints at the

time that I thought were evidence of radiculopathy.   The EMG

test, though, showed changes in the right arm in two muscles

that Dr. Levin interpreted as consistent with a remote

radiculopathy.

Q.   That would be consistent with a cervical nerve

compression, correct?

A.   That's correct.

       MR. FRIEDMAN:   Thank you, Dr. Shields.   That's all

I have.

                  REDIRECT EXAMINATION

BY MR. TRABOLD:

Q.   Doctor, I just want to draw your attention to Page 2 of

your report up at the top.   Just briefly, where it indicates

the sentence beginning:   MRI imagining of the cervical spine?

A.   Yes.

Q.   Can you indicate what that reads in your report.

A.   MRI imagining of the cervical spine was re-assessed in

February 2002, and was essentially unremarkable except for the

chronic changes of cervical fusion.

       MR. TRABOLD:   One moment, Your Honor.

Q.   Does your report make any mention of a limited cervical

range of motion?

A.   No, it does not.

       MR. TRABOLD:   Nothing further, Your Honor.

1         MR. FRIEDMAN:  Excuse me, Your Honor.  If I could

2   have one more question.

3                     RECROSS-EXAMINATION

4   BY MR. FRIEDMAN:

5   Q.  Did you actually test for that?

6   A.  I don't remember if I did or I didn't because I didn't

7   write it down.  I typically would, but I can't recall because

8   I didn't document it.

9   Q.  If you didn't test for it, it wouldn't be in here,

10  correct?

11  A.  That's correct.

12        MR. FRIEDMAN:  Thank you.

13        THE COURT:  Thank you, sir.

14        MR. TRABOLD:  Your Honor, the United States calls

15  Ron Habursky.

16        THE COURT:  Are you offering Exhibit 53?

17        MR. TRABOLD:  We would move for admission of

18  Government 53.

19        MR. FRIEDMAN:  No objection.

20        THE COURT:  I'll assume that there's no objection.

21  You don't need to say that each time.  I'll just assume

22  there's no objection unless there is an objection.

23        MR. TRABOLD:  Your Honor, just for ease of

24  administration, do you want us to separately provide you that

25  document, or are you just going to rely on your books?

1            THE COURT:  I'll rely on my books.

2        RONALD HABURSKY, a witness having been duly sworn,

3   testified as follows:

4            THE COURT:  Have a seat up here.  Give us your name

5   and spell your last name.

6            THE WITNESS:  Ron Habursky, H-A-B-U-R-S-K-Y.

7                       DIRECT EXAMINATION

8   BY MR. TRABOLD:

9   Q.  Sir, is it accurate to say that you are retired?

10  A.  Yes.

11  Q.  Where did you retire from?

12  A.  Erie Insurance Exchange.

13  Q.  How long did you work there?

14  A.  Second career, 31 years.

15  Q.  When you retired, what position did you hold with the

16  company?

17  A.  Litigation specialist.

18  Q.  How long were you a litigation specialist with Erie

19  Insurance?

20  A.  Since 1978.

21  Q.  Can you explain to the ladies and gentlemen of the jury

22  what your duties and responsibilities were as a litigation

23  specialist?

24  A.  Basically, my -- I considered myself a liaison between

25  defense counsel and the company.  My job entailed supervising

1  lawsuits and that were filed against our insureds or against

2  the company.  We assign those lawsuits to defense counsel and

3  I worked directly with defense counsel.

4         I also negotiated settlements and took part in

5  settlement negotiations in court, sat through trials and

6  handled uninsured and underinsured motorist claims.

7  Q.  Is it fair to say you typically became involved in a case

8  when litigation was involved or it appeared as if litigation

9  might become involved?

10  A.  Generally when a complaint was filed in a civil action or

11  a request for arbitration in an underinsured or uninsured

12  motorist claim.

13  Q.  The ladies and gentlemen of the jury might be familiar

14  with the term "insurance adjuster."  How did your job differ

15  from that of an insurance adjuster?

16  A.  I did not do any outside investigations.

17  Q.  You mean insurance investigations?

18  A.  Yes.

19  Q.  Now, sometime in 1985, did you take on the added

20  responsibility of underinsured motorists issues?

21  A.  In 1985, there was a change in the law where we went from

22  GAP coverage in Pennsylvania to excess.  What that did was

23  generate more underinsured motorist claims.

24  Q.  Can you explain to the ladies and gentlemen what an

25  underinsured motorist claim is.

A.   If the at-fault party has insufficient limits to pay for
the damages, then -- injury damages, then the insured can go
to his own carrier and collect, if they have the coverage,
collect money from their own policy for the amount not covered
by the underlying policy, liability policy.

Q.   So the insured motorist basically goes to their own
insurance carrier and taps into their underinsured motorist
provision of their own policy?

A.   Yes.

Q.   Around the time you retired, were you involved in a lot of
underinsured motorist issues or claims?

A.   Since -- I would say in the late '80s, early '90s, I had a
fair number of active cases.

Q.   Were a fair number of them underinsured motorist cases?

A.   Most of them were underinsured as opposed to uninsured.

Q.   Do the underinsured motorist cases have a level of
complexity or difficulty to them that the typical negligence
one would not have?

A.   No.  It's -- well, basically, in those cases, most of the
time there aren't liability issues, so you're dealing with
settlement of injury claims.

Q.   Is there an arbitration issue that is involved with the
underinsured motorist claims?

A.   At that time, yes.

Q.   Can you explain what that arbitration issue or process is

1    to the ladies and gentlemen of the jury.

2    A.   If an injured party -- normally, I receive files through

3    their attorneys.  They would indicate that they wanted to

4    present an underinsured motorist claim and proceed to

5    arbitration.  Under the policy, the insured or injured party

6    would select a party to represent them.  We would assign it to

7    defense counsel and with defense counsel discussions, we would

8    assign or retain an attorney to represent or be our

9    arbitrator, and then those two would choose a third

10   arbitrator.  In most cases -- in every case I dealt with, the

11   arbitrators were attorneys.

12   Q.   Are the arbitrators drawn -- how do they -- what

13   geographic area do they draw the arbitrators from?

14   A.   It varied.  There's -- we -- our office handled probably

15   10, 12 counties and we had claims throughout those counties.

16   So we tried to select an arbitrator within the county where

17   the arbitration would take place.  Under the policy, the

18   arbitration would take place where the injured or insured

19   party lived.

20   Q.   So ordinarily if a claim arose in let's say Erie County,

21   in your experience, the arbitrators would be ordinarily drawn

22   from Erie County?

23   A.   Yes.

24   Q.   Now, can you explain how the claims process works kind of

25   from start to finish.  Your claim comes into you that you need

1  to review.  What do you then do?  What is the first thing you

2  do when that claim comes in?

3  A.  Well, I look to see what -- generally, I review the file

4  notes of the previous claim handler, determine what was in the

5  file, reviewed the file and determined if there was anything

6  additional that needed to be done before evaluating the case.

7  Q.  In your experience, your typical claim, if such a thing

8  even exists, how long would it take you from start to finish

9  to finish the matter?

10  A.  That varied.  It could be -- if you had all the

11  information to evaluate, you could do it immediately.  If you

12  have to obtain information through a discovery type system, it

13  could take months.  I've had them last years.

14  Q.  And I guess -- let's limit it to the last let's say five

15  or ten years you worked for Erie Insurance.  On average, how

16  many cases or claims or files I guess would be being handled

17  at any given time?

18  A.  Well, I handled both the uninsured, underinsured and also

19  liability files, so at any one time, I probably had anywhere

20  from 90 to 125 active files.

21  Q.  Those 90 to 120 files are cases that you need to keep

22  moving through the system to a resolution of some sort?

23  A.  Yes.

24  Q.  Now, what would you characterize as the claimant's duties

25  when they file a claim with the insurance company, with Erie

1  or any other insurance company?

2  A.  Provide information to prove their claim.

3  Q.  And to tell the truth about the information?

4  A.  Yes.

5  Q.  And is it the claimant's duty to provide as complete a set

6  of information as they can?

7  A.  Yes.

8  Q.  Now, in a payment situation, when you make the decision or

9  when you made the decision when you worked for Erie Insurance

10  to pay a claim, was that claim just for the claimant's

11  injuries, or was that also for the -- to compensate the

12  claimant for the impact those injuries had on their life?

13  A.  Well, could be a combination of everything.  There's a lot

14  of different factors in each case.

15  Q.  Can you explain, what is the issue of bad faith as it

16  relates to this underinsured motorist issue or claim that

17  you've already described?

18  A.  Well, when a carrier arbitrates a case, when it actually

19  goes to arbitration and three arbitrators hear the case and

20  render their decision, if -- well, there's a lot of different

21  scenarios, but if their award would be let's say in excess of

22  the available underinsured policy limits, there is a

23  possibility that bad faith can be filed after that hearing and

24  alleged -- I've seen them where the injured party was forced

25  to go to arbitration to collect their money, therefore, they

1  should be entitled to collect the excess and also punitive

2  damages against the carrier for bad faith handling.  In all

3  cases, we're under obligation of good faith on handling with

4  the insureds.

5  Q.  Is it fair to say then that the bad faith issue is

6  something that is significant to any insurer?

7  A.  Yes.

8  Q.  And does that have anything to do with the fact that it

9  exposes the insurer to a higher exposure to liability, I

10  guess?

11  A.  Well, I don't know.

12  Q.  From a sense of punitive damages and that type of thing?

13  A.  Now are we talking underinsured or liability?

14  Q.  Underinsured.

15  A.  There's no risk to an insured in an underinsured

16  situation.

17  Q.  Explain that.

18  A.  Well, if there is -- if there's a punitive award out of a

19  bad faith suit, the punitive award is against the insurer, not

20  the insured.

21  Q.  Is against the insurance company?

22  A.  Yes.

23  Q.  So that's why it would be significant to the insurance

24  company?

25  A.  Yes.

Q.   Were you involved in the handling of Michael Joyce's

underinsured motorist claim which came to Erie Insurance in

August of 2002?

A.   Yes.

Q.   You mentioned before that file notes are placed in Erie

Insurance files?

A.   Yes.

Q.   Can you explain to the ladies and gentlemen of the jury

what is a file note, as you understand it to be from Erie

Insurance lingo?

A.   Most carriers have switched to electronic file notes.   In

the old days when I first started, we used to hand write all

the notes into the files.   Now, they have word processing

centers where you dictate notes, and you dictate notes

according to what activity you do on a file, summarizing

files, whatever.   Myself, I didn't like the word process

system so I hand typed my own notes in the system most of the

time.

Q.   Are the file notes in your experience kept by the

insurance, by Erie Insurance in the normal course of business?

A.   Yes.

Q.   If you go into any file with Erie Insurance there are

going to be file notes in there?

A.   Yes.

Q.   It's just basically a way for the person handling the

1  claim to write their notes in the file?

2  A.  Correct.

3  Q.  I'm going to show you now -- you should be able to read it

4  up there on the monitor.  This is what I've marked as

5  Government's Exhibit No. 2.  Can you see that there?

6        MR. FRIEDMAN:  What is the date on that?

7        MR. TRABOLD:  8-20-02.

8  BY MR. TRABOLD:

9  Q.  Can you read that, sir?

10  A.  I can read it.

11  Q.  Is that a file note that you would have drafted?

12  A.  No.

13  Q.  How do you know that?

14  A.  Just by the adjuster code H173, which was not my code.

15  Q.  Yours was E111?

16  A.  Yes.

17  Q.  Now, can you read for the ladies and gentlemen of the jury

18  what that says in that file note.

19  A.  Judge Joyce called in yesterday.  He's anxious for someone

20  to contact him reference his UIM, which is underinsured claim.

21  Kevin Nelson WAS the last name I saw on there yesterday.  I

22  left him a voice mail.  Never heard back from him.  I see now

23  that it has been assigned.  Please ask whoever gets this UIM

24  to call him as soon as possible.

25  Q.  This file note would have been drafted by J. Rekitt?

1    A.   Yes, Julie Rekitt.

2    Q.   That would have been an employee of Erie Insurance that

3    you're familiar with?

4    A.   Yes.

5    Q.   So on 8-20-2002, had you been assigned the Michael Joyce

6    file yet?

7    A.   No.

8    Q.   I want to show you what is marked here as Government's

9    Exhibit 3, which is a multipage document.

10             THE COURT:  Are you offering 2?

11             I'd like to have you offer them as they come in.

12             MR. TRABOLD:  I can do that, Your Honor.

13   BY MR. TRABOLD:

14   Q.   This is what I've marked as Government's Exhibit 3.  We

15   have file notes here that are attached.  Let me do these in

16   order, chronological order.

17             Take a look at that.  Would that have been a file

18   note that you drafted?

19   A.   Yes.

20   Q.   You know that because it says adjuster there E111?

21   A.   Correct.

22   Q.   The date on it is September 10, 2002?

23   A.   Yes.

24   Q.   And can you read for the ladies and gentlemen of the jury

25   what that says?

1   A.   It says:   File "reviewed" to me to handle, but I believe

2   it should have said file "referred" to me to handle potential

3   UIM claim.   Paper file was found on closed shelf as collision

4   sub was paid by State Farm and only other loss being paid was

5   FPB, which is first party benefits, until it was exhausted.   I

6   will write to the insured to advise him I am now involved in

7   the file and request med auth so I can get a copy of the FPB

8   file.

9   Q.   Does that mean the case would have come to you on

10  September 10, 2002?

11  A.   Yes.

12          MR. TRABOLD:   The front page will be 9-12.

13  Q.   Let me show you the front page of Government 3 and ask you

14  to take a look at that.

15          Can you indicate for the ladies and gentlemen of

16  the jury what date would be on that page?

17  A.   September 12, 2002.

18  Q.   Again, sir, would this have been a file note that you

19  would have drafted?

20  A.   No.

21  Q.   You know that because it says adjuster A108?

22  A.   Right.

23  Q.   Can you indicate for the ladies and gentlemen what that

24  file note indicates?

25  A.   Read the whole thing?

1  Q.   Sure.

2  A.   Judge Joyce did call today and left a message on my voice

3  mail wanting a call back at phone number.  I did call today

4  and I did advise the judge that I'm no longer the claim

5  adjuster handling this claim.  I explained that he could call

6  the Erie branch and make contact with the handling claim

7  adjuster.  I did give 001 -- which our, basically, the file

8  code for the insured -- the phone number for the Erie branch.

9  Judge Joyce said that he will wait to hear from the new

10 handling adjuster before trying to contact Erie.  He said he

11 did get the disclose authorization that I had sent prior to

12 being removed from the file and he said that he would hold

13 onto it and not complete it before speaking with the new

14 handling adjuster.  001 added that he still has to go to

15 Pittsburgh for medical treatment.  Said he might need surgery,

16 but is not sure he wants to have surgery.  He said he wanted

17 to run for the Supreme Court of Pennsylvania but he cannot

18 drive 50,000 miles in his car during a year.  He said that he

19 would have to drive two hours each way and he cannot do that

20 due to his injury.  I explained that I could not advise the

21 judge on any matter of the claim.  I was just calling today to

22 return his call from earlier today and he thanked me for

23 calling.

24 Q.   I'll show you second page of Government's 3.  Would that

25 have been a file note, the second page of Government 3 that

1  you drafted?

2  A.   Yes.

3  Q.   What does that indicate?

4  A.   Letter and authorization to the insured sent this date.

5  Q.   That would be on September 12th?

6  A.   Correct.

7         MR. TRABOLD:   Your Honor, we would move for

8  admission of Government's 3 and we will provide that extra

9  page so you have a complete copy of it.

10 BY MR. TRABOLD:

11 Q.   So, basically, these file notes, anything of significance

12 that happens with the insurance claim you document in the file

13 note or whoever is handling the particular issue?

14 A.   Yes.

15 Q.   Let me show you now what I've marked as Government's

16 Exhibit No. 4 and ask you to identify that.  Would that have

17 been a file note that you drafted, sir?

18 A.   Yes, it's a file note that I drafted.

19 Q.   Dated when?

20 A.   September 19, 2002.

21 Q.   What does it indicate?

22 A.   Insured sending in more medicals.

23 Q.   What does it indicate in the detailed section?

24 A.   Received a call from the insured.  He said he received the

25 narrative report from Dr. Thomas and has put that together.

1    The remainder of the medicals he has.  He said he will have

2    the package delivered to our office.  I told him we would

3    review the materials and evaluate and respond to his demand of

4    $500,000.

5              MR. TRABOLD:  Move for admission Government's

6    Exhibit 4.

7              THE COURT:  4 is admitted.

8    BY MR. TRABOLD:

9    Q.  So that file note indicates he made a $500,000 demand

10   around that time period?

11   A.  Sometime since I became involved in the file.

12   Q.  Let me show you what I've marked as Government's Exhibit

13   No. 5, sir.

14             Just so you know, if I can make that easier for you

15   to read or if there's anything I need to do, just let me know.

16   A.  This is a file note that I put in the file dated two days

17   before the other one, September 17, 2002.

18   Q.  This is again a file note drafted by you?

19   A.  Yes.

20   Q.  What does it indicate?

21   A.  Demand is $500,000.

22   Q.  Then the detailed section, what is indicated there?

23   A.  The insured was in the office this morning.  He brought in

24   part of the medical information he has accumulating from both

25   FPB and what State Farm had in their file.  The insured said

1   his medical bills were over $33,000 and he has been

2   responsible for making co-payments and he said some of the

3   office visits, which are not covered by his hospitalization,

4   have been written off by medical providers as professional

5   courtesy.  He continues to treat with Doctors John Lyons and

6   Joe Thomas.  He said both of them have recommended additional

7   surgery at this point.  He is resisting surgery.  They are in

8   the process of scheduling an appointment with Dr. Maroon, a

9   Pittsburgh neurosurgeon, for him to evaluate the insured's

10  present condition and see what his recommendation is on

11  surgery.  The insured is waiting for a narrative report from

12  Dr. Thomas and he will provide that report and the rest of his

13  medicals for our evaluation.  The insured said this accident

14  has caused problems with all his daily activities.  He said he

15  always enjoyed golf and scuba diving, but pays the price if he

16  should attempt to do either.  He said he has concentration

17  problems at work and it takes him twice as long to do the

18  research as it did before the accident.  Others have

19  recommended that he run for an opening on the Supreme Court

20  next year, but he said that he can't drive for any distance

21  and, therefore, he wouldn't be able to campaign.

22  Both Dr. Lyons and Dr. Thomas feel he sustained a closed head

23  injury from the motion caused by the rear-end collision.

24  Insured indicated he would provide me with a copy of the rest

25  of the medicals and also submit to an IME if one is requested.

1    He left stating he feels he can prove his injury is worth the

2    policy limits of $500,000.

3             MR. TRABOLD:  Judge, we move for admission of

4    Government's 5.

5             THE COURT:  5 is admitted.

6    Q.  Sir, this is what I've marked as Government's Exhibit No.

7    6.  I ask if you can identify that.

8    A.  This is a note I placed in the file on September 23rd of

9    2002.  It says:  Additional medicals received.

10            I received a letter from the insured dated 9-20-02

11   which included additional medical information including a

12   four-page narrative medical report from Dr. Joseph Thomas

13   which summarizes all of the injuries sustained by the insured

14   in this accident and behalf of all the treating physicians,

15   relates them to this accident with a reasonable degree of

16   medical certainty.  Dr. Thomas feels the insured will need

17   additional cervical surgery and also lumbar surgery and

18   estimates the cost to be $125,000.  I will be reviewing the

19   medicals, but I'm not sure we have -- I'm not sure there is

20   enough information to complete evaluation.

21            MR. TRABOLD:  Your Honor, we move for admission of

22   Government 6.

23            THE COURT:  6 is admitted.

24   Q.  Sir, this is what I've marked as Government's Exhibit

25   No. 7.  Please identify that.

A.  It's a note from my supervisor to myself.  It says:

Please advise when meeting should be set.

It says:  Ron, 001 has made demand.  We have

medicals and need to respond officially to 001.  We need to

set up meeting and discuss our position.  Do we have enough

medical information to extend an offer?  If not, exactly what

do we need to request?  Also, does 001 want to wait until next

year to see if he needs surgery?  If he does, we need specific

letter to him confirming any conversation we have with him

indicating his intentions.  Please review and let's set

meeting within the next couple weeks to discuss our options.

MR. TRABOLD:  Your Honor, we move for admission of

Government 7.

THE COURT:  7 is admitted.

Q.  Just so the ladies and gentlemen of jury are clear, 001

would be Mr. Joyce?

A.  Yes.

Q.  And your supervisor at the time would have been Mark

Harrington?

A.  Yes.

Q.  Sir, I'm going to show you what I've marked as

Government's Exhibit No. 8.  Identify that.

A.  That's another note from Mark Harrington to myself.  It is

dated October 31, 2002.  Please convert to home office.

Ron, I met with Mark Smith and Jack O'Neil and

1    Chuck Werling on another matter and we also discussed this

2    file.  They would like this converted to home office and they

3    will review.  If we haven't already, we should also get a

4    letter out to 001 advising the present status, explaining

5    exactly where we are at this time regarding waiting, securing

6    medicals, et cetera.

7    Q.  Can you explain to the ladies and gentlemen of the jury

8    what is the significance or what is meant by converting the

9    file to the home office?

10   A.  In the home office, there's a corporate claims department

11   who oversees files being handled in the branches.  Most of the

12   cases are referred to them.  There's -- I want to think of the

13   word -- criteria for conversion to home office.  Some of the

14   criteria, death cases, severe burns, coverage issues, a number

15   of issues.  They're prescribed as to what needed to be

16   converted and sent to the home office.  The home office didn't

17   receive a copy of every claim file that a branch office would

18   handle.

19   Q.  Is it accurate to say then that those files which were

20   maybe thornier or more difficult to handle or more complex

21   were often converted to the home office?

22   A.  Yes.

23   Q.  Do you know why it is that this case would have had to

24   have been referred to the home office?

25   A.  No.

1          MR. TRABOLD:  Your Honor, we move for admission of

2    Government 8.

3          THE COURT:  8 is admitted.

4    Q.  Sir, this is one marked Government 9.  Can you identify

5    that, please.

6    A.  It's a note from myself to my supervisor.  It says:  You

7    need to send Chuck Werling an AP, assignment pending.

8          I tried to send Chuck an assignment on his file,

9    but I can't do it as you are the controlling supervisor.  File

10   has been copied and hand-delivered to Chuck.

11   Q.  Can you explain why is it that you -- what assignment

12   would you have been sending to Chuck?

13   A.  It would be the home office conversion.  Off of that, he

14   sets up his own diary system.

15         MR. TRABOLD:  Your Honor, we move for admission of

16   Government's Exhibit 9.

17         THE COURT:  9 is admitted.

18   Q.  I'm going to show you what I've marked as Government's

19   Exhibit No. 10 and ask if you can identify that, please.

20   A.  It's a file note I put in.  It just says:  Advise agent of

21   reserve change.

22   Q.  That's a file note that you drafted?

23   A.  Yes.  It should have said "advised" agent.

24   Q.  What is the date on that?

25   A.  November 20, 2002.

1   Q.  Can you explain to the ladies and gentlemen of the jury

2   what the change in reserve, what is that?

3   A.  When files are received, initial claim reserve is set up

4   with the thought that until we have more information or are

5   able to evaluate the claim, we set up initial reserves, which

6   is a way for Erie to set aside money in view of making a

7   potential payment on a claim.

8   Q.  So the reserve is just the amount of money that the

9   insurance company initially sets aside to handle the claim?

10  A.  Yes.

11  Q.  And that can be changed, depending on the circumstances

12  changing, or other things?

13  A.  Yes.

14  Q.  So in this case, you change the reserve then sometime in

15  November of '02?

16  A.  Yes.

17          MR. TRABOLD:  I move for the admission of

18  Government's Exhibit 10.

19          THE COURT:  Admitted.

20  Q.  Explain to the ladies and gentlemen of the jury why you

21  would have changed the reserve in Mr. Joyce's case when you

22  did?

23  A.  Well, going through the file notes, probably at that time,

24  I had an opportunity to review the file, review the medicals

25  and make my evaluation of the potential exposure in the case.

1  Q.   I'm going to show you now what I've marked as Government's

2  Exhibit No. 11 and ask if you can identify that?

3  A.   Again, one of my file notes.  It's a meeting to discuss

4  demand.  I met with attorneys Jan Van Gorder, Gary Veshecco,

5  Ted Miller and home office claims examiner Werling on November

6  19, 2002, to discuss insurance policy limits demand of

7  500,000.  I have been provided medical information from the

8  insured and the most recent report from Dr. Joseph Thomas

9  provides a complete overview of the insured's injuries, his

10  treatment to date and what future problems he might have and

11  what surgery is anticipated.  The insured has a prior injury

12  at the C5-6 level which was fused in 1992.  Dr. John Lyons has

13  reviewed the imaging studies done after this accident and

14  states there are broad-based bulges at C3-4 resulting in both

15  C4 nerve root compression and some central C5 compression.

16  There is also a bulge above the C5-6 level which clearly is

17  impacting on the right C6 nerve root.  Dr. Thomas then states

18  the insured has a permanent injury at the present time because

19  of the multilevel involvement.  He also states a surgery

20  although it might be effective in relieving fasciculations

21  would lead certainly to a multi-level anterior cervical

22  diskectomy and interbody fusion and resulted loss of range of

23  motion and increased cervical stiffness to the point where the

24  insured would have little, if none, ability to rotate his

25  neck.  There is also broad-based bulge at L5-S1 which they

1  believe explained the back and leg complaints.  Dr. Thomas

2  also discusses the insured's closed head injury and how it

3  will eventually improve but will have a disruptive effect on

4  his life.  He also discusses the misdiagnoses of ALS and how

5  that affected the insured emotionally.  Dr. Thomas believes

6  the insured will require both cervical and lumbar surgery and

7  estimates the cost to be $125,000.

8         MR. TRABOLD:  I move for admission of Government's

9  11.

10        THE COURT:  11 is admitted.

11  Q.  This is what I've identified as Government Exhibit No. 12.

12  I ask if you can identify that.

13  A.  This is a continuation of the note I just read.

14         After reviewing the medicals, we discussed the

15  arbitration procedures.  We agreed it would be difficult to

16  find anyone who would want to serve as a defense arbitrator

17  because of the insured's position.  We then discussed the

18  value and I advised that with the information we have been

19  provided by the insured, I did not feel this was a $500,000

20  case, but if the surgery was necessary, it could be well be

21  worth the limits or more.  We decided that I should meet with

22  the insured and attempt to settle this claim within the policy

23  limits.  After the meeting, I contacted the insured and we

24  agreed to meet on November 21 at his office.

25  Q.  You, in fact, did that, you met with him on November 21?

A.   Yes.

        MR. TRABOLD:   I move for admission of Government's
Exhibit 12.

        THE COURT:   12 is admitted.

Q.   I have marked that as Government's Exhibit 13.   Can you
identify that, please.

A.   That's another file note from me.   Meeting with the
insured.

        Met with the insured this morning.   I provided him
with my comments on the medical information he submitted and
advised him I was evaluating the claim based on the medicals
we had in our file presently without the benefit of any prior
medicals or IME.   He did tell me he was examined by an
associate of Dr. Maroon, team physician to the Pittsburgh
Steelers, last month and was waiting for his report.   The
doctor has advised the insured he will need the two-level
surgery but to prolong the surgery as it will result in
insured not being able to rotate his neck in either direction.
The insured said he would provide the report as soon as it was
received.   I then explained to the insured that based on the
information I had, I valued the case, including a factor for
surgery, at $300 ,000.   I made the offer to him.   He then said
that the case evaluated by four high profile plaintiff
attorneys around the state and they all felt the case was
worth more than the limits in arbitration.   Insured feels a

1   large component of his claim is the value of not being able to

2   run for the Pennsylvania Supreme Court which he wanted to do.

3   After further discussion, I asked the insured if there was a

4   number between his demand and my $300,000 offer which he felt

5   would be acceptable to him.  He then said, I would need to get

6   near 400,000.  I asked him how near, and he said 400, but

7   after another short discussion, we agreed on $390,000.  I then

8   mentioned a structure and he was not at all interested and

9   said he just wanted cash.  I then mentioned a confidentiality

10  clause in the release and he felt it was advisable.  We agreed

11  I would prepare the release and meet with him again on

12  November 26 for him to review the release, sign it, if he had

13  no problems with the language, and then I would give him the

14  settlement check.

15          MR. TRABOLD:  We would ask for admission of

16  Government's 13.

17          THE COURT:  13 is admitted.

18  Q.  This is what I had marked as Government Exhibit 14.  I ask

19  if you can identify that.

20  A.  That's another note of mine to the file.  Settlement

21  completed/closing file.

22          I met with the insured this morning and he reviewed

23  the release prepared by the law division which included a

24  confidentiality clause.  The insured added language to the

25  release to reflect our waiver of sub against the tort feasor.

1  Release signed and check given to the insured.  My diary is

2  closed.  As instructed, I will give the original file to Jim

3  Witkowsky to keep in a locked closet.

4  Q.  So on November 26, '02 that's when you would have handed

5  the $390,000 correct to Mr. Joyce?

6  A.  Yes.

7  Q.  Can you explain to the ladies and gentlemen why the file

8  needed to be kept in the lock cabinet?

9  A.  I don't know the real answer -- the answer to that.  I was

10  told that that's where it would go and I gave it to Jim

11  Witkowsky who was the branch claims manager.

12          MR. TRABOLD:  We move for admission of Government

13  14.

14          THE COURT:  14 is admitted.

15  Q.  I'll show you now what I have marked as Government Exhibit

16  15 and ask if you can identify that.  There's actually two

17  pages.  Can you identify what that is.

18  A.  That's a letter from Michael T. Joyce to myself.

19  Q.  Can you read it for the ladies and gentlemen of the jury.

20  Before you read it, please indicate the date on which or the

21  date depicted on the letter?

22  A.  September 17, 2002.

23  Q.  What does Mr. Joyce write to you?

24  A.  "It was a pleasure speaking with you yesterday and

25  reminiscing about the good old days.  It's hard to believe,

1   but I'm now in my 19th year as a judge.  Time just flies by.

2            "As we've discussed during our conversation

3   yesterday, I am providing you with a copy of the medical

4   specials summary I have prepared.  It includes information I

5   got from Erie's first party benefit file as well as

6   information I received from my private health care carrier.  I

7   do not have all the bills, but I believe these are the

8   majority of them.  Additionally, you will note that I do not

9   have a copy of the bill from Meadville Medical Center for a

10  bone scan and some flex x-rays, but I believe it was right

11  around $470.  I am in the process of getting a copy of the

12  bills that Blue Cross paid, but that may take some time.

13           "Dr. Thomas has informed me I will most likely

14  require surgery on both my cervical and lumbar spine.  I am

15  being scheduled to see a Dr. Maroon, who is the neurosurgeon

16  for the Pittsburgh Steelers -- they probably need a

17  psychiatrist more at this point, for a surgical consult.  As I

18  indicated to you, I want to avoid surgery, if at all possible.

19  Dr. Lyons and Dr. Thomas believe that I can put off making

20  that decision until sometime next year and continue

21  conservative measures.  I will keep you informed of any

22  significant problems concerning my claim, however, if you have

23  any questions or require additional information, please do not

24  hesitate to contact me.

25           "I'll look forward to working with you on this

1  claim and am hopeful that we can arrive at an agreeable

2  resolution."

3          MR. TRABOLD:  Your Honor, we move for admission of

4  Government's Exhibit 15.

5          THE COURT:  15 is admitted.

6  Q.  Sir, this is what I've marked as Government's Exhibit

7  No. 16.  I ask if you can identify that.

8  A.  It's a letter from Michael T. Joyce to myself dated

9  September 20th.

10          It says:  "Pursuant to your request during our

11  meeting at your office on September 17th, 2002, I'm providing

12  you with copies of all the medical reports and office notes

13  that I have in my file.  After I returned to my office, I

14  contacted Dr. Thomas' office regarding status of the medical

15  report he was preparing.  He had, in fact, just completed the

16  report.  I have enclosed the report with his office notes.

17          "I have enclosed records from the following --" and

18  there's -- do you want me to list all of them?

19  Q.  No.  It indicates he's enclosed records from 13 different

20  doctors or entities?

21  A.  Yes.

22  Q.  What does it say after that, sir?

23  A.  "I have also enclosed a narrative statement on damages for

24  your review in conjunction with the medical reports.  I

25  believe that you will find the medical records contain

1    objective findings that fully support my claim.

2            "As I indicated during our meeting, my demand is

3    for the policy limits under the underinsured provisions of my

4    policy with Erie Insurance.

5            "Please do not hesitate to contact me if you have

6    any questions regarding the enclosed materials or require

7    additional information.

8            "Again, I look forward to working with you on this

9    and look forward to hearing from you in the near future."

10           MR. TRABOLD:  Your Honor, we move for admission of

11   Government 16.

12           THE COURT:  16 is admitted.

13   Q.  Sir, I'm going to show you what I've marked now as

14   Government's Exhibit 17 and ask if you can identify that.

15   A.  It's a letter from Michael Joyce dated November 15th to

16   myself.

17           "On September 17, 2002, I provided you with a copy

18   of all my medical specials and pursuant to your request, I

19   provided you with copies of all medical reports and office

20   notes along with a narrative statement on damages on September

21   20, 2002.  It is now almost two months later and I have not

22   heard a word from Erie Insurance.

23           "I'm disappointed that you have elected to ignore

24   my claim and have not complied with notification requirements

25   of the Unfair Claims Act.  If I do not hear from you as a

1  result of this correspondence, I will assume that I need to

2  retain counsel and litigate this matter."

3  Q.  Let me turn this over and show you, can you identify what

4  is depicted on the second page?

5  A.  That would be the envelope with my name and address on it,

6  the office name and address.

7  Q.  It shows the postmark date of what, sir?

8  A.  November 15th.

9  Q.  So the letter from November 15th from Mr. Joyce would have

10  been mailed to you through the United States mail?

11  A.  Yes.

12  Q.  You paid Mr. Joyce 11 days after you received this letter?

13  A.  Yes.

14          MR. TRABOLD:  We move admission of Government's

15  Exhibit 17.

16          THE COURT:  17 is admitted.

17  Q.  Sir, I'm going to let you actually look at this.  I have

18  marked this as Government's Exhibit 18.  I ask if you can

19  identify what that is.

20  A.  This is a copy of the Erie Insurance Auto Policy.

21  Q.  That would be the policy for Mr. Joyce at the time?

22  A.  Well, this would have been the policy jacket, yes.

23          MR. TRABOLD:  We move for the admission of

24  Government's 18.

25          THE COURT:  18 is admitted.

A.   I assume that's the right edition of the policy.  There's

no edition dates marked on it.  The policy jackets and

languages change every now and then, so I can only assume that

that was the one in effect at the time of this accident.

Q.   If this is the policy that we would have received as part

of Mr. Joyce's Erie Insurance file, would that be the policy

applicable to his claim?

A.   I would agree with that.

Q.   Now, sir, did you have anything to do or did you handle in

any way or ever look at the damage done do Mr. Joyce's

vehicle?

A.   No.

Q.   I'm going the take these slightly out of numerical order.

         This is Government's Exhibit No. 20.  Can you

identify what that is.

A.   That is the settlement check that I had issued to

Michael T. Joyce in the amount of $300,000.  It's November

something, November 26th, I believe.

Q.   This check you would not have mailed out to him, you

actually handed it to him directly?

A.   Well, he signed -- by my previous note, he signed the

release and I exchanged that with the check.

         MR. TRABOLD:  I move for admission of government

20.

         THE COURT:  20 is admitted.

  1          MR. TRABOLD:  Your Honor, we took this slightly out

  2  of sequence so we've marked it Government's Exhibit 1A.

  3  Q.  Can you identify what Government's 1A is?

  4  A.  Narrative Statement of Damages, gives Erie's claim number,

  5  Erie insured Michael T. Joyce, date of loss, 8-10-01.

  6  Q.  Would this have been the Narrative Statement of Damages

  7  Mr. Joyce sent you as part of his insurance claim?

  8  A.  Yes.

  9  Q.  That is referenced in both your case notes and his one

 10  letter to you?

 11  A.  Yes.

 12  Q.  So you would have received this then on or around

 13  September 20th '02?

 14  A.  Yes.

 15          MR. TRABOLD:  Your Honor, can we just go to

 16  side-bar for one second.

 17    (Discussion at sidebar.)

 18          MR. TRABOLD:  Your Honor, I didn't know, I just

 19  wanted to bring up this might be a good spot to end for the

 20  day because we're going to start getting into additional --

 21          THE COURT:  You have more to go.

 22          MR. TRABOLD:  Yes, Your Honor.

 23          THE COURT:  Let's call it a day.

 24          MR. TRABOLD:  I wanted to bring that up.

 25          (End of discussion at sidebar.)

1            THE COURT:  This looks like a good spot to stop for

2    the day, ladies and gentlemen.  So, we'll begin again tomorrow

3    morning at nine-thirty.

4            Please remember the instructions not to talk to

5    anybody about the case or read or listen to anything about it.

6    Have a good evening.  Leave your notebooks in the jury room.

7        (Court adjourned.)

8                        -----

9                      I-N-D-E-X

10   WITNESS              Direct      Cross      Redirect      Recross

11   R. Shields, M.D.       85         98          104          105
     Ronald Habursky       106         --           --           --

12

13

14                   C E R T I F I C A T E

15

16           I, Juliann A. Kienzle, certify that the
     foregoing is a correct transcript from the record of proceedings
     in the above-titled matter.

17

18   s/Juliann A. Kienzle
     _____
19   Juliann A. Kienzle, RMR, CRR

20

21

22

23

24

25